895 P.2d 676

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Charles D. CHRISTIAN, Defendant–Appellant.**

No. 15,484.

Court of Appeals of New Mexico.

March 13, 1995.

Certiorari Denied April 20, 1995.

Tom Udall, Atty. Gen., Joel Jacobsen, Asst. Atty. Gen., Santa Fe, NM for plaintiff-appellee.

Sammy J. Quintana, Chief Public Defender, Susan Gibbs, Asst. Appellate Defender, Santa Fe, NM for defendant-appellant.

## OPINION

BOSSON, Judge.

Defendant appeals his conviction for driving while under the influence of intoxicating liquor (DWI), based upon a blood-alcohol level exceeding .10%. We discuss whether a blood-alcohol report from the Scientific Laboratory Division of the New Mexico Department of Health (state laboratory), can properly be admitted into evidence under the exceptions to the hearsay rule for business records and public records, where the author of the report does not testify. *See* SCRA 1986, 11–803(F) & (H) (Repl.1994). We also discuss whether admission of this report violates Defendant's right to confrontation under the United States Constitution. We affirm Defendant's conviction based on that report. *See* NMSA 1978, § 66–8–102(A) & (C) (Cum.Supp.1993) (effective until Jan. 1, 1994).

## FACTS

While driving home on April 30, 1993, Defendant swerved to avoid hitting a herd of antelope running across the road. His van veered to the side of the road, rolled over, and landed in a ditch. Defendant admitted drinking two beers in town and buying another six-pack on the way home. Upset about the accident, Defendant drank another four beers at the accident site. When police arrived, the van was upright in the ditch with the engine running and the tires spinning. Defendant was sitting in the driver's seat. Several witnesses testified to Defendant's appearance of intoxication.

At the hospital, Defendant consented to a blood-alcohol test in the presence of a state police officer. The officer observed the nurse draw two vials of blood using a kit provided by the state laboratory. The officer helped seal the vials and send them to the state laboratory for analysis.

A chemist for the state laboratory, Alexander Gallegos, extracted two samples from one vial and tested each sample for blood-alcohol content. Based on the two independent tests, Gallegos prepared a blood-alcohol report (the Gallegos report), which concluded that Defendant's blood-alcohol level was .16%, far in excess of the legal limit. However, Gallegos did not testify at trial. Instead, the State called his supervisor, Dr. Jeffrey Robb, to lay the evidentiary foundation for the test results and blood-alcohol report. Based upon Dr. Robb's testimony, the blood-alcohol report was admitted into evidence as a business record.

Using a general verdict, a jury found Defendant guilty of DWI. The trial court instructed the jury that it could convict upon a finding of driving either, "while under the influence" or, in the alternative, with a blood-alcohol level of .10% or more. NMSA 1978, § 66–8–102(A) & (C); SCRA 1986, 14–4501 & 14–4503. The jury was not required to speci-

fy the basis for its verdict. At the time of Defendant's conviction, *State v. Shade*, 104 N.M. 710, 722, 726 P.2d 864, 876 (Ct.App.), *cert. quashed*, 104 N.M. 702, 726 P.2d 856 (1986) required that, under a general verdict, sufficient evidence support each alternative theory of guilt. The very recent opinion of this Court in *State v. Olguin*, 118 N.M. 91, 879 P.2d 92 (Ct.App.), *cert. granted*, 118 N.M. 90, 879 P.2d 91 (1994), overruled *Shade* on this point. *Id.* at 98, 879 P.2d at 99. Because *Olguin* was filed after Defendant's conviction, the parties disagree about its applicability to this case. We need not decide this issue because the evidence sufficiently supports both theories. In fact, Defendant does not deny the presence of substantial evidence to prove driving "under the influence," based upon the rather graphic testimony of those who observed Defendant at the scene. Instead, Defendant challenges the alternative basis for his conviction, namely the blood-alcohol level of .10% or more. Underlying that challenge, Defendant attacks the admission of the Gallegos report into evidence and any reference to that report in Dr. Robb's testimony.

## DISCUSSION

### 1. Business Records Exception

The reliability of business records is usually premised upon routine, trusted patterns of record generation and the confidence engendered by showing that a particular record is created and maintained in conformity with that routine. *See United States v. Blackburn*, 992 F.2d 666, 670 (7th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 393, 126 L.Ed.2d 341 (1993). The Advisory Committee Note to Rule 803 of the Federal Rules of Evidence (virtually identical to New Mexico's Rule 11–803(F)) states:

> The element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation.

Fed.Rules Evid.Rule 803, 28 U.S.C.A. (West 1984).

Defendant argues that these blood-alcohol reports do not satisfy this criteria. Specifically, Defendant would confine business records admitted under Rule 803(F) to information relied upon by a business as accurate internal records, like personnel or accounting documents, which are created in the ordinary course of business. In contrast, Defendant challenges blood-alcohol reports created by the state laboratory because they are based upon individual tests. Since each report is prepared only once, from a test for one individual, Defendant argues that blood-alcohol reports cannot be the product of "systematic checking," continuity, habit, and routinely repeated activity. Further, unlike personnel or accounting records, the state laboratory itself does not rely upon the accuracy of these records for its own internal purposes; reports are prepared for others, and unlike a for-profit business, the state laboratory does not suffer financially if these records fail. Finally, Defendant emphasizes that the state laboratory prepares the reports specifically for litigation, not "in the ordinary course" of its own internal business, and Defendant correctly notes that documents with a specific litigation motive demand closer scrutiny. *See* John Wentworth, *New Mexico Rules of Evidence* 803–23 (Murl A. Larkin ed., rev. ed. 1991) [hereinafter Larkin]; 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 803(6)[07], at 803–208 (1990) [hereinafter Weinstein].

■ In our judgment, Defendant takes too narrow a view of the Rules of Evidence. While the model he proposes of personnel and accounting records might arguably be the safest in terms of reliability and trustworthiness, this does not mean that other records, like those offered here, cannot also satisfy a threshold standard of reliability. *See State v. Ramirez*, 89 N.M. 635, 645–46, 556 P.2d 43, 52–53 (Ct.App.1976) (state police crime laboratory reports admissible where proper foundation of trustworthiness has been established).

■ Dr. Robb laid an extensive foundation. Pursuant to NMSA 1978, Section 24–1–22 (Repl.Pamp.1994), the state laboratory has a legal duty to monitor and certify all blood-alcohol testing. This duty includes the

establishment of quality control measures for the laboratory, usually in the form of regulations. The state laboratory has a corresponding duty to comply with the division's regulations. *Id.* Therefore, there is every indication of a "duty to make an accurate record" within the meaning of the federal Advisory Committee Note.

■ Dr. Robb testified to the state laboratory's compliance with this duty. He stated that the state laboratory regularly and routinely performs blood-alcohol tests in thousands of DWI cases from across the state, as well as in post-mortem examinations to determine the cause of death. Proper quality control procedures employed by the state laboratory include preserving the blood sample in two separate vials. Only one vial is tested; the other is kept in cold storage. If there are any doubts about the veracity of the initial test, the second vial is available for retesting and comparison. The actual testing is performed by a gas chromatograph machine which is calibrated daily. Defendant did not challenge the reliability of the gas chromatograph at trial. A laboratory chemist then follows a certain specified procedure that translates the results of the gas chromatograph test into blood-alcohol content. Thereafter, the chemist prepares reports, just like the one in question. Although the state laboratory is not a for-profit business, chemists like Gallegos must produce accurate reports or face termination. Further, the state laboratory maintains a reputation for the high degree of accuracy in its blood-alcohol determinations. Therefore, these reports share many of the characteristics noted in the federal Advisory Committee Note of systematic checking, regularity, continuity, habits of precision, actual experience of reliance, and a duty of accuracy.

■ Furthermore, the uncontradicted evidence was that chemist Gallegos prepared this report in strict accordance with these same procedures. Dr. Robb reviewed the report and concluded that Gallegos followed appropriate test procedures. Defendant presented no evidence to the contrary, such as an irregularity in the procedures. Dr. Robb personally confirmed the conclusions of the Gallegos report by recalculating Defendant's blood-alcohol level based upon the gas chromatograph results, in effect retracing the same steps followed by Gallegos. Although Dr. Robb did not perform or supervise the original test, this fact is of little consequence when the test is done mechanically. The business record exception only requires the foundational testimony of a "qualified witness"; it is not limited to the one performing the test. There is no dispute as to Dr. Robb's credentials. *See Ramirez,* 89 N.M. at 645, 556 P.2d at 52.

■ Finally, although the Gallegos report was arguably prepared with at least the potential of litigation in mind, there was no evidence that Gallegos had prepared the report differently from any of the thousands of other reports similarly situated. In other words, this was not a deviation from normal practice, for example, where a business might have some ulterior motive with regard to a document specifically prepared to help its case in court. *See* Larkin, *supra,* at 803–23; Weinstein, *supra,* at 803–208. This was part of the laboratory's business: to prepare reports which might be presented in court. Indeed, the trial court took additional comfort in the fact that state laboratory personnel prepared these reports, including the Gallegos report, knowing: (1) that they might have to defend their work in court; (2) that the Gallegos report was verifiable (or subject to challenge) by virtue of the untested portion of the blood sample, held in reserve; and (3) that their professional reputations, and perhaps their jobs, were at risk if they should be proven wrong. We are not persuaded that we should exclude valid test results on the premise that they *might* be introduced at trial. *See Abdel v. United States,* 670 F.2d 73 (7th Cir.1982) (food stamp fraud investigative report admissible because prepared pursuant to separate statutory duty and not just in anticipation of litigation); *Garcia v. State,* 868 S.W.2d 337 (Tex.Crim.App.1993) (en banc) (autopsy report held admissible where preparer of report has duty to investigate cause of death, regardless of existence of criminal prosecution). The trial court was within its discretion to admit this particular report into evidence as a "business record," or more accu-

rately as a "record of regularly conducted activity." *See State v. Rivera*, 115 N.M. 424, 429, 853 P.2d 126, 131 (Ct.App.) (admission of hearsay evidence is reviewed for a clear abuse of discretion), *cert.denied*, 115 N.M. 228, 849 P.2d 371 (1993); *see also State ex rel. for the Use of Electric Supply Co. v. Kitchens Constr., Inc.*, 106 N.M. 753, 756, 750 P.2d 114, 117 (1988) (computer printout admitted as business record); *State v. Ruiz*, 94 N.M. 771, 775, 617 P.2d 160, 164 (Ct.App. 1980) (hospital records admissible as business record). This is consistent with analogous rulings in other states. *See Burp v. State*, 612 N.E.2d 169, 172 (Ind. Ct.App.1993) (medical records containing results of blood test admitted under business record exception); *Scott v. Angie's Inc.*, 153 Mich.App. 652, 396 N.W.2d 429, 435 (Mich. Ct.App.1986) (same); *Mitchell v. State*, 750 S.W.2d 378, 379 (Tex.Crim.App.1988) (blood-alcohol record admitted under business record exception).

Alternatively, the State argued that even if the Gallegos report were inadmissible, Dr. Robb's expert opinion, standing alone, proved that Defendant's blood-alcohol level was above .10%. *See* SCRA 1986, 11–703 (Repl. 1994) (expert's opinion may be based on facts or data not admissible into evidence). Therefore, the State reasons that admission of the Gallegos report, if error, was harmless. Because we hold the Gallegos report admissible, we need not address this issue.

### 2. *Public Records Exception*

The public records exception to the hearsay rule SCRA 11–803(H), admits into evidence most public records, "excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel."[1] *See* SCRA 11–803(H)(2). Defendant seeks to exclude the Gallegos report and test results because, arguably, they derive from matters observed by the arresting police officer and purported law enforcement personnel at the state laboratory.

■ Initially, we emphasize that the state laboratory is part of the State Department of Health; it is not an arm of law enforcement and its employees are not law enforcement personnel. Moreover, even documents prepared by the state police crime laboratory can satisfy the public records exception where an adequate foundation for reliability is laid. *Ramirez*, 89 N.M. at 644–46, 556 P.2d at 51–53.

Defendant relies primarily upon the opinion of the United States Court of Appeals in *United States v. Oates*, 560 F.2d 45 (2d Cir. 1977). In *Oates*, the trial court admitted into evidence, pursuant to the business records and public records hearsay exceptions, a handwritten worksheet of a United States Customs Service chemist, who analyzed a white powdery substance and concluded that it was heroin. *Id.* at 63. The chemist himself *did not testify at trial*. *Id.* at 64. Rather, another Customs chemist who had performed hundreds of similar tests testified regarding test procedure and reliability and thereby laid the foundation for the report. *Id.* at 64–65. On appeal, the Second Circuit reversed, reasoning that the chemist's report included a factual finding which resulted from a law enforcement investigation, thereby making it ineligible for the public records exception to hearsay or any other exceptions to the hearsay rule.

■ *Oates* has undergone severe scrutiny. *See, e.g., United States v. Rosa*, 11 F.3d 315, 332 (2d Cir.1993), *certs. denied*, —— U.S. ——, 114 S.Ct. 1565, 128 L.Ed.2d 211 *and* —— U.S. ——, 114 S.Ct. 1864, 128 L.Ed.2d 485 (1994); *Blackburn*, 992 F.2d at 671; *United States v. Hayes*, 861 F.2d 1225, 1229 (10th Cir.1988); *United States v. Picciandra*, 788 F.2d 39, 44 (1st Cir.), *cert. denied*, 479 U.S. 847, 107 S.Ct. 166, 93

---

1. **H. Public records and reports.** Records, reports, statements or data compilations, in any form, of public offices or agencies, setting forth

   (1) the activities of the office or agency,

   (2) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or

   (3) in civil actions and proceedings and against the state in criminal cases factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

L.Ed.2d 104 (1986); *United States v. Metzger*, 778 F.2d 1195, 1201 (6th Cir.1985), *cert. denied*, 477 U.S. 906, 106 S.Ct. 3279, 91 L.Ed.2d 568 (1986); *United States v. Wilkinson*, 804 F.Supp. 263, 267 n. 5 (D.Utah 1992); *see generally* Weinstein, *supra*, ¶ 803(8)[04], at 258–62. Some courts limit the holding in *Oates* by excluding only those reports of police investigations which contain the kind of adversarial and subjective commentary often found in such documents. *See United States v. Quezada*, 754 F.2d 1190, 1193–94 (5th Cir.1985); *see also United States v. Wilmer*, 799 F.2d 495, 500–01 (9th Cir.1986) (citing *United States v. Hernandez–Rojas*, 617 F.2d 533, 534–35 (9th Cir.), *cert. denied*, 449 U.S. 864, 101 S.Ct. 170, 66 L.Ed.2d 81 (1980)), *cert. denied*, 481 U.S. 1004, 107 S.Ct. 1626, 95 L.Ed.2d 200 (1987). Cases such as *Quezada* admit reports similar to the one at hand, because they closely follow a routine manner of preparation, in a non-adversarial setting, which creates a certain level of comfort as to their reliability. The Fifth Circuit Court of Appeals summarizes this distinction as follows:

> [i]n the case of documents recording routine, objective observations, made as part of the everyday function of the preparing official or agency, the factors likely to cloud the perception of an official engaged in the more traditional law enforcement functions of observation and investigation of crime are simply not present.

*Quezada*, 754 F.2d at 1194.

■ We find this reasoning persuasive, and we note it is consistent with New Mexico precedent. *See State v. Stout*, 96 N.M. 29, 32, 627 P.2d 871, 874 (1981) (penitentiary records used to prove that defendant was previously convicted admissible as public record); *State v. Linam*, 93 N.M. 307, 600 P.2d 253 (1979); *Rivera*, 115 N.M. at 429, 853 P.2d at 131. In *Linam*, our Supreme Court emphasized that the exclusion of public records "is aimed at reports of law enforcement personnel engaged in investigative and prosecutorial activities where the officer himself should testify." *Linam*, 93 N.M. at 308, 600 P.2d at 254. The Court admitted into evidence records from the state penitentiary pertaining to photographic and fingerprint

identification because they were not "investigative or prosecutorial," and we believe that distinction applies equally to the records before us. *See United States v. DeWater*, 846 F.2d 528, 530 (9th Cir.1988) (results of intoxilyzer test admitted under public record exception); *Wilkinson*, 804 F.Supp. at 267 (blood alcohol report admissible under public records exception). Therefore, the Gallegos report is admissible as a public record as well.

### 3. *Confrontation Clause*

■ Defendant next argues that his lack of an opportunity to cross-examine Gallegos violated his constitutional right to confrontation. *See In re Troy P.*, 114 N.M. 525, 530, 842 P.2d 742, 747 (Ct.App.1992) (the confrontation clause bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule). It is well established that although "evidence may have been admissible under an exception to the hearsay rule [this] does not necessarily satisfy defendant's constitutional right of confrontation." *State v. Austin*, 104 N.M. 573, 574, 725 P.2d 252, 253 (Ct.App.1985); *but cf. State v. Wynne*, 108 N.M. 134, 139–40, 767 P.2d 373, 378–79 (Ct.App.1988) (no violation of confrontation clause where other indicia of reliability of business records), *cert. denied*, 108 N.M. 115, 767 P.2d 354 (1989).

■ The confrontation clause places two conditions on the admission of hearsay evidence: necessity and reliability. *Austin*, 104 N.M. at 575, 725 P.2d at 254. Previously we discussed the indicia of reliability that justified admitting this report into evidence. With regard to necessity, the prosecution must usually either produce the declarant whose statement will be used against the defendant or demonstrate the declarant's unavailability for trial. *Id.* However, this requirement can be excused when:

> (1) the utility of cross-examination as to the particular records is minimal or remote; (2) the other evidence at trial affords defendant an adequate opportunity to test the reliability of the records; or (3) public policy considerations otherwise excuse the prosecution from producing the

out-of-court declarant or showing his or her unavailability.

*Id.* at 575–76, 725 P.2d at 254–55.

█ In the matter before us, although the State did not attempt to explain Gallegos' unavailability, the trial court had sufficient reason to excuse his testimony. First, the gas chromatograph test was purely mechanical. Dr. Robb testified:

> Because once the sample was prepared and put on, into the gas chromatograph for analysis, the entire testing procedure is done electronically or mechanically. The analyst no longer intervenes in the analytical process. It is entirely controlled by the instrumentation. So whether he actually stood by and watched or didn't stand by and watch, the instrument would still function the same, and the results that were produced were produced by the instrument.

*See State v. Wilson–Bey,* 21 Conn.App. 162, 572 A.2d 372, 377 (1990) (right to confrontation not violated where test results of bodily fluids was the product of a standard testing procedure); *see generally* Laird C. Kirkpatrick, *Confrontation and Hearsay: Exemptions from the Constitutional Unavailability Requirement,* 70 Minn.L.Rev. 665, 701 (1986) ("The higher the reliability of the testing procedure, the lower the necessity for confrontation. The greater the objectivity of the test, the less its susceptibility to testing by cross-examination.") (footnote omitted). Second, Dr. Robb testified as to the validity and accuracy of the Gallegos report. He clearly had knowledge about the testing procedure and the manner in which the Gallegos report was compiled and was available for cross-examination into these matters. *Cf. Austin,* 104 N.M. at 576, 725 P.2d at 255 (computer printouts not admissible where witnesses testifying were not knowledgeable about how printouts were prepared or preserved or how information was fed into computer). Further, given the number of tests a chemist performs, it is doubtful that Gallegos would have had any independent or specific recollection of the Defendant's blood-alcohol report. Under this circumstance, it is likely that Gallegos would have based his testimony on laboratory notes, which Dr. Robb was well qualified to interpret and which were available to the Defendant for examination. Therefore, the "utility of cross-examination" was "minimal" in regard to a personal appearance by Gallegos. *See Rosa,* 11 F.3d at 333 (no confrontation clause violation when court found report contained "particularized guarantees of trustworthiness.") (quoting *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)); *Reardon v. Manson,* 806 F.2d 39, 41 (2d Cir.1986), *cert. denied,* 481 U.S. 1020, 107 S.Ct. 1903, 95 L.Ed.2d 509 (1987); *State v. Moosman,* 794 P.2d 474, 480 (Utah 1990); *State v. Mann,* 135 Wis.2d 420, 400 N.W.2d 489, 492 (1986). Accordingly, we hold that, under the circumstances of this case, there is no confrontation clause violation.

## CONCLUSION

For the above reasons, we affirm Defendant's conviction.

IT IS SO ORDERED.

BLACK and FLORES, JJ., concur.