2004-NMSC-037

102 P.3d 628

**STATE of New Mexico, Plaintiff–Petitioner,**

v.

**Phillip DEDMAN, Defendant–Respondent.**

No. 28,261.

Supreme Court of New Mexico.

Nov. 17, 2004.

Patricia Madrid, Attorney General, Steven S. Suttle, Assistant Attorney General, Albuquerque, NM, for Petitioner.

John Bigelow, Chief Public Defender, Kathleen T. Baldridge, Assistant Appellate Defender, Santa Fe, NM, for Respondent.

## OPINION

MINZNER, Justice.

{1} The State appeals from an unpublished opinion of the Court of Appeals, *State v. Dedman*, No. 23,476 (N.M.Ct.App. Aug. 8, 2003), affirming an order suppressing evidence of a blood alcohol test in a prosecution for aggravated driving while under the influence of intoxicating drugs (DWI), contrary to NMSA 1978, § 66–8–102(D) (1999, prior to 2003 & 2004 amendments). The Court of Appeals concluded that the State had failed to lay an adequate foundation for admission of the report because it did not offer proof that Defendant's blood was drawn using the veni-puncture method. *Dedman*, No. 23,476, slip op. at 6. The State appeals pursuant to NMSA 1978, § 39–3–3(B)(2) (1972) and Rule 12–502 NMRA 2004, contending that whether or not the veni-puncture method of drawing blood was used to obtain the sample did not

affect the admissibility of the blood alcohol report and that the unavailability of the nurse who drew the sample to testify at trial did not require the exclusion of the report. We hold that the State's offer of proof, which included the testimony of the toxicologist who prepared the report and the officer in whose presence the blood was drawn, provided sufficient foundation for admission of the report and that lack of opportunity to cross-examine the nurse who drew the sample did not violate Defendant's confrontation rights. We therefore reverse and remand.

## I

{2} On January 15, 2002, Defendant, while allegedly intoxicated, drove his pick-up truck into a street sign while attempting to elude police officers in McKinley County, New Mexico. After Defendant was placed in custody, he was taken by ambulance to the hospital because he had welts, bruises, and swollen eyes. At the hospital, Officer Anthony Ashley asked Defendant to take a blood alcohol test because he could smell the odor of intoxicating liquor coming from Defendant's breath. Defendant consented to having his blood drawn, and the test was conducted in the presence of Officer Ashley.

{3} Defendant was charged by criminal information with two counts of aggravated assault upon a peace officer, contrary to NMSA 1978, § 30–22–22 (1971); one count of resisting, evading or obstructing an officer, contrary to NMSA 1978, § 30–22–1 (1981); and one count of aggravated driving while under the influence of intoxicating liquor or drugs, contrary to Section 66–8–102(D). Defendant was convicted of the offense of resisting, evading, or obstructing an officer and the lesser included offense of assault upon a peace officer, contrary to NMSA 1978, § 30–22–21 (1971). Defendant was acquitted on the second count of aggravated assault upon a peace officer. As for the aggravated DWI charge, following the State's offer of proof, the district court excluded a blood alcohol report as violative of Defendant's right to confrontation because the nurse who drew the blood samples was unavailable to testify. The district court then recessed Defendant's

trial on this charge and permitted the State to appeal.

{4} The Court of Appeals affirmed the district court on different grounds. In affirming the district court's suppression of the report, the Court of Appeals noted that, under NMSA 1978, § 66–8–110(A) (1993, prior to 2003 amendment), the results of a blood alcohol test could be introduced into evidence when the test was performed pursuant to the Implied Consent Act, NMSA 1978, §§ 66–8–105 to –112 (1978, as amended through 1993, prior to 2003 amendment). *Dedman,* No. 23,476, slip op. at 3. NMSA 1978, § 66–8–107(A) (1993) of the Implied Consent Act requires that blood tests be approved by the Scientific Laboratory Division (SLD) of the Department of Health pursuant to NMSA 1978, § 24–1–22 (1981, prior to 2003 amendment), and Section 24–1–22(A) authorizes SLD to "promulgate ... methods to test persons believed to be operating a motor vehicle under the influence of ... alcohol." *See Dedman,* No. 23,476, slip op. at 3–4. Under this authority, SLD had promulgated a regulation, Blood and Breath Testing Under the New Mexico Implied Consent Act, 7.33.2.12(A)(1) NMAC, (2001), which required, among other things, that blood samples be "collected by veni-puncture." *Dedman,* No. 23,476, slip op. at 3–4. The Court of Appeals concluded that strict compliance with the veni-puncture method was a prerequisite to the admission of the blood alcohol report. *Id.* at 5–6. In the absence of confirmation that veni-puncture had been utilized, the exclusion of the report was proper. *Id.* at 6. The Court of Appeals did not address whether the report's admission would have violated Defendant's right to confrontation. *Id.* The Court reasoned that in the absence of evidence that the blood test was conducted in accordance with a statutorily mandated regulation requiring that the blood sample be collected using the "veni-puncture" method, it was not an abuse of discretion to exclude the report. *Id.* at 2, 6. The State petitioned for a writ of certiorari.

{5} On appeal, the State contends that the Court of Appeals erred in affirming the district court's order. The State argues that the Court of Appeals erred because as a

general rule the foundational requirements for admission of such a report are met when the record or document is identified and testimony is offered as to the mode of preparation and storage. The State contends that it satisfied these requirements when Juliana Lucero, a forensic toxicologist employed by the SLD, "testified extensively about the blood kits, their preparation, and the manner in which samples are preserved and tested." The State suggests that whether or not Defendant's blood was drawn using the veni-puncture method might have affected the weight to be given the report but did not affect its admissibility. The State contends that the district court erred in excluding the report on Confrontation Clause grounds. The State argues that once a record is determined to be admissible under the hearsay exception for regularly kept records, the Confrontation Clause does not require its exclusion. Defendant asks the Court to quash its writ of certiorari, arguing that the Court of Appeals properly applied the relevant statutes, regulations, and case law; we decline to do so. *See generally State v. Urban*, 2004-NMSC-007, ¶ 10, 135 N.M. 279, 87 P.3d 1061 ("[W]e would encourage parties whenever possible to present those arguments [regarding a request to quash certiorari] in a response to the petition itself, as provided by Rule 12-502(D) [NMRA 2004], rather than in the course of briefing the merits of the appeal."). We are persuaded the Court of Appeals erred in its application of the relevant statutes, regulations and case law. *Cf. State v. Conn*, 115 N.M. 99, 100, 847 P.2d 744, 745 (1993) (quashing the writ of certiorari in part on the ground current law had not been misstated or misapplied).

## II

▪ {6} The first issue we consider is whether the Court of Appeals erred by affirming the exclusion of the blood alcohol report on the basis that the "collection by veni-puncture" requirement was not met. We consider whether proof of veni-puncture is a prerequisite to the admissibility of blood alcohol reports.

## A

{7} "Chemical test legislation generally authorizes the state's health department, attorney general, or other administrative agency to promulgate methods of chemical testing and analysis." 3 Richard E. Erwin, *Defense of Drunk Driving Cases:* § 28.02[3], at 28–17 (3d ed.2003). Courts around the country have differed on whether absent strict compliance with such rules and methods, test results are inadmissible. *Id.* at 28–17 n. 15. Some courts have held that failure to introduce evidence that the test was conducted in strict compliance with the promulgated methods made the results inadmissible. *See Webb v. State*, 378 So.2d 756, 757 (Ala.Crim.App. 1979); *Caffey v. State*, 43 Ark.App. 160, 862 S.W.2d 293, 294 (1993); *State v. Hansen*, 203 N.W.2d 216, 223 (Iowa 1972). Other jurisdictions have held test results were admissible with the lack of compliance going only to the weight of the evidence. *See Thomas v. People*, 895 P.2d 1040, 1041 (Colo.1995); *State v. Wickern*, 411 N.W.2d 597, 599 (Minn.Ct.App. 1987); *State v. Place*, 128 N.H. 75, 513 A.2d 321, 323 (1986).

{8} In New Mexico, lack of strict compliance with SLD regulations concerning blood alcohol tests initially was not viewed as making the results inadmissible; rather, the failure to comply was considered "essentially an attack on the weight of the evidence." *State v. Watkins*, 104 N.M. 561, 564, 724 P.2d 769, 772 (Ct.App.1986). This approach was based on the recognition that it is for the finder of fact to resolve conflicts in the evidence. *See State v. Lankford*, 92 N.M. 1, 2, 582 P.2d 378, 379 (1978); *State v. Casteneda*, 97 N.M. 670, 678, 642 P.2d 1129, 1137 (Ct.App.1982) (stating that it is the role of the factfinder to resolve any conflicts in the evidence and to determine the credibility and weight to afford the evidence). As a result, the Court of Appeals held in *Watkins* that in enacting Section 24-1-22, which authorizes the SLD "to promulgate and approve satisfactory techniques or methods to test persons believed to be operating a motor vehicle or a motorboat under the influence of drugs or alcohol," our Legislature had not intended to create a statutory right or make compliance

with SLD regulations mandatory. 104 N.M. at 564, 724 P.2d at 772.

{9} In 1993, however, our Legislature amended the Implied Consent Act and the DWI statutes. *See* 1993 N.M. Laws, ch. 66 (amending NMSA 1978, §§ 66–8–102,–102.1, –107, & –109 to –112). In particular, the 1993 revision modified Section 66–8–110(A) so that blood alcohol tests "performed pursuant to the Implied Consent Act" may be admitted in DWI prosecutions. Additionally, the Implied Consent Act was amended to provide that tests "approved by the scientific laboratory division of the department of health pursuant to the provisions of Section 24–1–22" be administered at the direction of a law enforcement officer.

{10} Defendant relies on *State v. Gardner*, 1998–NMCA–160, 126 N.M. 125, 967 P.2d 465 and *State v. Onsurez*, 2002–NMCA–082, 132 N.M. 485, 51 P.3d 528, in arguing that these 1993 amendments suggest the Legislature intended that strict compliance with all SLD techniques and methods would be required for the admissibility of blood alcohol test results in criminal prosecutions. Defendant argues that *Gardner* held that, taken together, the DWI statutes, the Implied Consent Act, and administrative regulations indicate strict compliance with regulations governing blood alcohol testing is required and results of tests not performed in accordance with regulations were not admissible. Defendant also contends that, according to *Onsurez*, when a defendant properly preserves an objection regarding the annual certification of a breath intoxilizer machine as per SLD regulations, the prosecution must show, as a prerequisite to admission of a breath test result, that the machine used to conduct the test had been properly certified. Defendant's reliance on these two cases is misplaced.

{11} In *Gardner*, the Court of Appeals reversed the defendant's DWI conviction because the district court improperly admitted breath alcohol test results. 1998–NMCA–160, ¶¶ 20, 22, 126 N.M. 125, 967 P.2d 465. The Court of Appeals concluded that the State had not proved that it followed a regulatory requirement that the defendant be observed for twenty minutes prior to the collection of a breath sample. *Id.* ¶ 9. Thus,

the State failed to lay an adequate foundation for admission of the test results. *Id.* ¶ 5. Nevertheless, the *Gardner* opinion was based on the recognition that the purpose of complying with the observation period requirement for breath alcohol tests was to ensure the accuracy of the test. *Id.* ¶ 12. The purpose behind the observation period was to ensure that prior to sample collection the subject would not engage in any activity, such as regurgitating or introducing a foreign substance into his or her mouth, that would compromise the test results. *Id.* ¶¶ 6, 12. We conclude *Gardner* holds that non-compliance with a regulation that goes to the accuracy of the test makes the results inadmissible. We note that in *State v. Montoya*, 1999–NMCA–001, ¶ 9, 126 N.M. 562, 972 P.2d 1153, the Court of Appeals gave the same reading to *Gardner*, saying "we held that, in amending the DWI statutes, the [L]egislature intended that compliance with at least those regulations that went to the accuracy of the test would be a condition precedent to admissibility."

{12} In *Onsurez* the Court of Appeals again concluded that the trial court had admitted test results without a proper foundation. 2002–NMCA–082, ¶¶ 12–13, 132 N.M. 485, 51 P.3d 528. The regulation at issue in *Onsurez* also went to accuracy. The regulation at issue required that an Intoxilizer 5000 machine used to conduct breath alcohol tests be certified annually, which in turn included annual SLD inspections and weekly calibration checks to ensure that the equipment was working properly. *Id.* ¶ 13. Certifications of Intoxilizer 5000 Breathalyzer machines relate to the routine function of the equipment in order "to insure that it gives accurate readings." *State v. Ruiz*, 120 N.M. 534, 538, 903 P.2d 845, 849 (Ct.App.1995) (quoted authority omitted).

{13} We conclude the Legislature required compliance with the regulations at issue in both *Gardner* and *Onsurez* in order to ensure accurate results. *Gardner* and *Onsurez* do not support the view that the Legislature intended that compliance with all SLD regulations would be a prerequisite to admission of blood test results. We agree that if an accuracy-ensuring regulation is not

satisfied, the result of the test in question may be deemed unreliable and excluded. *See State v. Baker*, 56 Wash.2d 846, 355 P.2d 806, 809–10 (1960) (en banc). When the purpose of administrative rules is to ensure the accuracy of test results and those foundational requirements are not met, the test results may be excluded. *People v. Boughner*, 209 Mich.App. 397, 531 N.W.2d 746, 747 (1995). We are not convinced, however, that strict compliance with all regulatory requirements is necessary for admissibility. We conclude that the Legislature intended, in enacting the 1993 amendments, to mandate the exclusion of test results whenever proof of compliance with a regulation intended to ensure accuracy is missing. Therefore, in determining whether proof of veni-puncture is a prerequisite to the admissibility of blood alcohol reports, we must examine the purpose behind the veni-puncture requirement.

## B

{14} Blood is collected by three principal methods: veni-puncture, skin-puncture, and arterial-puncture. Ruth E. McCall & Cathee M. Tankersley, *Phlebotomy Essentials*, 204 (3d ed.2003). Veni-puncture is the term used to describe the method of collecting blood from the vein, and "[i]t is the most common way to collect blood specimens for laboratory testing." *Id.* at 242. Because arteries are further below the surface of the skin than veins, the vein is considered "the safest and most convenient site from which to draw blood." 3 Donald H. Nichols & Flem K. Whited III, *Drinking/Driving Litigation* § 23:4, at 23–4 (2d ed.1998). Therefore, under normal conditions, a blood sample is collected using the veni-puncture method. *Id.*

{15} Skin-puncture, also called derma or capillary puncture, "involves penetrating the capillary bed in the dermis of the skin ... in order to collect a blood specimen." McCall & Tankersley, *supra*, at 332. The skin-puncture method is usually employed in obtaining blood from infants and children. *Id.* at 339. This method is usually employed because infants and children have a comparatively small blood volume, and "removing the larger quantities of blood typical of venipuncture or

arterial puncture can lead to anemia ... [or even] cause cardiac arrest." *Id.*

{16} Skin-puncture is used on adults when there are no accessible veins, to save veins for other procedures, when the subject has clot-forming tendencies, and "for certain bedside and home-testing procedures such as glucose monitoring." *Id.* at 338. When using the skin-puncture method, blood is collected from the finger in adults and from the heel in the case of infants. *Id.* at 332, 339–46. Skin-puncture only yields small volumes of specimen. *Id.* at 332, 338.

{17} Arterial puncture is the term that describes the method of drawing blood from an artery. *Id.* at 402. "[B]ecause arterial puncture is technically more difficult to perform and potentially more painful and hazardous to the patient than venipuncture, arterial specimens are not used for routine blood tests." *Id.* Instead, arterial punctures are primarily performed in order to obtain blood for evaluation of arterial blood gases, which in turn "is used in the diagnosis and management of respiratory disease to provide valuable information about a patient's oxygenation, ventilation, and acid-base balance." *Id.*

{18} It appears that the choice of one blood collection rather than another depends on the identity of the subject and the purpose of extraction, rather than on specific reliability concerns. If, for instance, the blood is to be extracted from an infant or child, skin puncture would be the preferred method of blood collection. *Id.* at 339. If, on the other hand, an examination of the subject's oxygenation levels is sought, the arterial puncture method is employed. *Id.* at 402. If the subject is an adult, and "normal conditions" exist "the sample is drawn from a vein." Nichols & Whited III, *supra*, § 23:4, at 23–4.

{19} Accordingly, the SLD regulation that veni-puncture be utilized in the collection of samples for blood alcohol level laboratory testing appears to be based on the recognition that veni-puncture is the safest and most convenient way to draw blood from adults. *See id.* Regulation 7.33.2.12(A)(1) seeks to ensure that the collection of blood samples be done using "the most common" method.

McCall & Tankersley, *supra*, at 242. Additionally, the regulation attempts to avoid blood collection through methods that may be more difficult for the blood drawer and potentially more painful and hazardous for the patient than veni-puncture. *See id.* at 402.

{20} Furthermore, veni-puncture is not necessarily a more reliable method than arterial-puncture in all circumstances. *See* Nichols & Whited III, *supra*, § 23:4, at 23–3 to 23–4. In comparing venous blood extraction versus arterial blood extraction, variances in blood alcohol level readings may occur as a result of the timing of the collection. *Id.* During the absorption of alcohol, arterial blood has a higher alcohol concentration level. *Id.* During elimination, however, venous blood has a higher alcohol concentration, and "[d]uring equilibrium, venous and arterial blood alcohol concentrations are the same." *Id.* at 23–4. Therefore, the reason for collection through veni-puncture is not a higher probability of accuracy. Instead, veni-puncture is the preferred method for collecting blood alcohol samples from adults because extraction is easier, less hazardous, and less painful when conducted through the vein.

{21} Consequently, we do not believe that the purpose behind the veni-puncture requirement is to ensure the accuracy of the blood test results. Therefore, since the veni-puncture provision in Regulation 7.33.2.12(A)(1) is not one that goes to the accuracy of the test, we conclude that failure to comply with the regulation does not render the results wholly unreliable and does not justify exclusion. Accordingly, we hold that compliance with the "collection by veni-puncture" requirement is not a prerequisite to the admissibility of blood alcohol reports.

### C

{22} For these reasons, we hold that the Court of Appeals erred in affirming the exclusion of the blood alcohol report on the basis that the "collection by veni-puncture" requirement was not met. We note that subsequent to trial and after the Court of Appeals filed its opinion we proposed a change in Criminal Form 9–505 NMRA 2004 on the recommendation of the New Mexico Attorney General and the SLD. *See* Vol. 43, No. 21, N.M. SBB 15–17. The proposed revised form included a form of certification by the person drawing any blood sample that the sample "was collected using the entire contents of a state scientific laboratory division approved blood collection kit in accordance with scientific laboratory division's approved instructions." *Id.* at 16. By order dated August 19, 2004, we have now approved the form effective for cases filed after November 1, 2004. The use of this form is intended to simplify the foundational requirement the State must satisfy in moving the admission of the results of a blood alcohol test. The new form responds to the Court of Appeals' holding that the State had not laid an adequate foundation for admission of the blood alcohol report because there was no evidence the drawer had followed the relevant regulations. The new form should facilitate the State's ability to lay an adequate foundation. We next address the question of whether Defendant's lack of opportunity to cross-examine the nurse who actually drew the blood sample violated his Confrontation Clause rights.

### III

{23} We review questions of admissibility of evidence as an exception to the hearsay rule for abuse of discretion. *State v. Johnson*, 99 N.M. 682, 687, 662 P.2d 1349, 1354 (1983). However, objections to admissibility based on confrontation grounds are separate from those raised under the hearsay rules. *Ruiz*, 120 N.M. at 536, 903 P.2d at 847. Questions of admissibility under the Confrontation Clause are questions of law, which we review de novo. *Id.*

### A

{24} The New Mexico Rules of Evidence provide for the admission of "reports ... of public offices or agencies, setting forth ... matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel." Rule 11–803(H) NMRA 2004. The SLD is a divi-

sion of the New Mexico Department of Health. Defendant's blood alcohol report, prepared by SLD, qualifies as a "public record." SLD employees are not police officers nor are they law enforcement personnel. Therefore, blood alcohol reports such as the one at issue here are prepared in a non-adversarial setting. *See State v. Christian,* 119 N.M. 776, 782, 895 P.2d 676, 682 (Ct.App. 1995). Because these reports are prepared in such a setting, "the factors likely to cloud the perception of an official engaged in the more traditional law enforcement functions of observation and investigation of crime are simply not present." *Id.* (quoting *United States v. Quezada,* 754 F.2d 1190, 1194 (5th Cir.1985)). This Court has previously noted that the exclusion of public records "is aimed at reports of law enforcement personnel engaged in investigative and prosecutorial activities." *State v. Linam,* 93 N.M. 307, 308, 600 P.2d 253, 254 (1979). A blood alcohol report is neither investigative nor prosecutorial. *Christian,* 119 N.M. at 782, 895 P.2d at 682. SLD-prepared blood alcohol reports follow a routine manner of preparation that guarantees a certain level of comfort as to their trustworthiness. *Id.* Nothing in the record in this case suggests that the routine was deviated from, nor that the procedures or results were unreliable. We conclude that the report in question was admissible as a public record and do not address its admissibility under other hearsay exceptions.

## B

{25} Both the United States Constitution and the New Mexico Constitution provide that "[i]n all criminal prosecutions," the defendant has a right "to be confronted with the witnesses against him." U.S. Const. amend. VI; N.M. Const. art. II, § 14 (amended 1994). The right of confrontation requires an independent inquiry that is not satisfied by a determination that evidence is admissible under a hearsay exception. *State v. Austin,* 104 N.M. 573, 574, 725 P.2d 252, 253 (Ct.App.1985); *State v. Martinez,* 99 N.M. 48, 51, 653 P.2d 879, 882 (Ct.App.1982). When an out-of-court statement is offered against a criminal defendant, the prosecution "must satisfy the constitutional requirements of the sixth and fourteenth amendments, as well as any evidentiary rules." *Austin,* 104 N.M. at 575, 725 P.2d at 254.

{26} In *Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), *modified, Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that the Confrontation Clause constrains the admission of hearsay in a criminal trial in two ways. The first constraint, the rule of necessity, requires that the prosecution "either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Id.* The second constraint reflects the Confrontation Clause's "underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence." *Id.* Therefore, this second aspect requires that the out-of-court statement offered for admission bear adequate "indicia of reliability." *Id.* at 65–66, 100 S.Ct. 2531 (quotation marks and quoted authority omitted). In New Mexico, our Court of Appeals has applied *Roberts* to the hearsay exceptions for business and public records. In *Austin,* the Court of Appeals held after applying *Roberts* that the defendant's right of confrontation was violated by the admission of computerized records against the defendant. 104 N.M. at 576, 725 P.2d at 255. In *Christian,* the Court of Appeals again applied *Roberts* but this time held the defendant's right of confrontation was not violated by the admission of blood alcohol reports. 119 N.M. at 782–83, 895 P.2d at 682–83.

{27} *Crawford* has called into question the continued validity of our analysis in *Austin* and *Christian.* In *Crawford,* the Court examined the history of the Confrontation Clause and concluded that "history supports two inferences about [the Clause's] meaning." *Id.* at 1363. The first inference was that the primary concern that the Confrontation Clause sought to remedy involved the admission of "testimonial hearsay." *Id.* at 1365. The second inference was "that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he [or she] was unavailable to testify, and the defendant had had a previous opportunity for cross-exami-

nation." *Id.* After its historical analysis, the Court concluded that the *Roberts* test's "unpardonable vice ... [was] its demonstrated capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude." *Id.* at 1371. Therefore, the Court discarded the *Roberts* test for determining the admissibility of testimonial hearsay, holding instead that "[w]here testimonial evidence is at issue ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 1374.

{28} Nevertheless, *Crawford* expressly distinguished between testimonial and nontestimonial hearsay evidence and applied the new rule only to testimonial evidence. *Id.* The Court, however, "[left] for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Id.* Despite the Court's reluctance to provide a "comprehensive definition," it did volunteer examples of evidence that were clearly within the "testimonial" category, such as "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and ... police interrogations." *Id.*

■ {29} After *Crawford* we must ask two questions. First, is the blood alcohol report testimonial evidence? While the Court did not "spell out a comprehensive definition of 'testimonial,'" *id.*, it listed "[v]arious formulations of [the] core class of 'testimonial' statements." *Id.* at 1364. Further, the Court's historical analysis indicates that the core concern is government officers who are prosecuting or investigating a crime, or interrogating or at least questioning a witness. *Id.* at 1364–65 (cataloging today's government officers analogous to government officers with whom the Founders were concerned). One concise definition consistent with the "various formulations" and historical analysis is in a footnote, "[i]nvolvement of government officers in the production of testimony with an eye toward trial," because this provides a "unique potential for prosecutorial abuse." *Id.* at 1367, n. 7.

{30} As we explained above, a blood alcohol report is generated by SLD personnel, not law enforcement, and the report is not investigative or prosecutorial. Although the report is prepared for trial, the process is routine, non-adversarial, and made to ensure an accurate measurement. While a government officer prepared the report, she is not producing testimony for trial. Finally, a blood alcohol report is very different from the other examples of testimonial hearsay evidence: "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and ... police interrogations." *Crawford*, 124 S.Ct. at 1374. We conclude that the blood alcohol report is not testimonial evidence.

■ {31} Our second question is whether we should continue to apply the *Roberts* test to non-testimonial hearsay evidence. There are two reasons we could conclude yes. First, we could determine that the federal Confrontation Clause still requires the application of the *Roberts* test to non-testimonial hearsay evidence, *Crawford* notwithstanding. Second, we could determine that the New Mexico Confrontation Clause requires the application of the *Roberts* test to non-testimonial hearsay evidence.

{32} A close reading of *Crawford* indicates that *Roberts* still applies to non-testimonial hearsay evidence, though the Court appears split on whether it should. The Court did not overrule prior case law holding that the Confrontation Clause is concerned with more than testimonial evidence. It stated

> In *White* [*v. Illinois*, 502 U.S. 346, 352–53, [112 S.Ct. 736, 116 L.Ed.2d 848] (1992)], we considered [whether the Confrontation Clause applies "only to testimonial statements"] and rejected [that position]. Although our analysis in this case casts doubt on that holding, we need not definitively resolve whether it survives our decision today....

*Crawford*, 124 S.Ct. at 1370. In addition, the Court stated that it has "considered reliability factors beyond prior opportunity for cross-examination when the hearsay statement at issue was not testimonial." *Id.* at 1368. Finally, the Court did not overrule *Roberts*, and it did not reply to the dissent's assertion that it had done so. *Id.* at 1374 (Rehnquist, C.J., dissenting).

{33} We think this analysis clarifies the Court's statement near the end of its opinion that

> [w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.

*Crawford*, 124 S.Ct. at 1374. In other words, *Roberts* still applies to non-testimonial hearsay, though the Court may later conclude that the Sixth Amendment is not concerned with non-testimonial hearsay. Other state courts have concluded the same. *See State v. Rivera*, 268 Conn. 351, 844 A.2d 191, 202 (2004) (concluding that *Roberts* remains in place for determining the admissibility of non-testimonial hearsay); *State v. Blackstock*, 598 S.E.2d 412, 423 n. 2 (N.C.Ct.App. 2004) ("*Roberts* remains good law regarding nontestimonial statements.").

{34} *Crawford* notwithstanding, the federal Confrontation Clause requires the application of *Roberts* to non-testimonial hearsay evidence. If the Supreme Court later overrules *Roberts*, or rules that the federal Confrontation Clause applies only to testimonial evidence, we can determine at that time whether the New Mexico Confrontation Clause requires the *Roberts* test or another reliability test. Thus, in this appeal we apply *Roberts*.

## C

■■■■ {35} We analyze Defendant's Confrontation Clause claim under the *Roberts* analysis discussed and applied in *Austin* and *Christian*. *See Horton v. Allen*, 370 F.3d 75, 84–85 (1st Cir.2004) (applying *Roberts* and holding that non-testimonial statements made in private to an acquaintance were admissible under the firmly rooted state of mind exception and did not violate the Confrontation Clause); *Perkins v. State*, No. CR–02–1779, —— So.2d ——, 2004 WL 923506, at *6, (Ala.Crim.App. Apr.30, 2004) (applying *Roberts* and concluding that an autopsy report was admissible under the business records exception and, as within a firmly rooted exception, satisfied the Con-

frontation Clause). As noted above, "[t]he [C]onfrontation [C]lause places two conditions on the admission of hearsay evidence: necessity and reliability." *Christian*, 119 N.M. at 782, 895 P.2d at 682; *see also Austin*, 104 N.M. at 575, 725 P.2d at 254. Necessity requires that the prosecution either produce the declarant or demonstrate the declarant's unavailability for trial. *Christian*, 119 N.M. at 782, 895 P.2d at 682. However, this requirement is excused if:

> (1) the utility of cross-examination as to the particular records is minimal or remote; (2) the other evidence at trial affords defendant an adequate opportunity to test the reliability of the records; or (3) public policy considerations otherwise excuse the prosecution from producing the out-of-court declarant or showing his or her unavailability.

*Id.* at 782–83, 895 P.2d at 682–83 (quoting *Austin*, 104 N.M. at 575–76, 725 P.2d at 254–55); *accord Roberts*, 448 U.S. at 65 n. 7, 100 S.Ct. 2531 ("A demonstration of unavailability ... is not always required," such as when "the utility of trial confrontation [is] so remote that it [does] not require the prosecution to produce a seemingly available witness.").

{36} In this case, the utility of cross-examination was remote. Defendant wanted the opportunity to cross-examine the nurse in order to ascertain whether the veni-puncture method of blood collection was employed. However, we have already determined that whether veni-puncture was used or not did not affect accuracy of the result and therefore is not relevant to the admissibility of the report. Accordingly, the lack of relevance of the desired cross-examination rendered its utility remote. *Cf. State v. Owens*, 103 N.M. 121, 127, 703 P.2d 898, 904 (Ct.App.1984) (determining that the utility of cross-examination was remote when the stated purpose was not relevant to guilt).

■■■■ {37} The second condition to admissibility, under *Roberts*, requires that the evidence in question bear adequate " 'indicia of reliability.' " 448 U.S. at 66, 100 S.Ct. 2531. "Reliability can be inferred without more in a case where the evidence falls within a firmly

rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.* In this case, the blood alcohol report was admissible under the public records exception to the hearsay rule. This exception is firmly rooted. *Roberts,* 448 U.S. at 66 n. 8, 100 S.Ct. 2531 ("Properly administered the business and public records exceptions would seem to be among the safest of the hearsay exceptions.") (quotation marks and quoted authority omitted); *accord, e.g., United States v. Hernandez–Herrera,* 273 F.3d 1213, 1218 (9th Cir. 2001) ("The public records exception is a firmly rooted exception to the hearsay rule."). This exception's reliability "is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation." *Christian,* 119 N.M. at 779, 895 P.2d at 679 (quoting Fed.R.Evid. 803 advisory committee's note); *accord id.* at 782, 895 P.2d at 682 (noting that public records are reliable "because they closely follow a routine manner of preparation, in a non-adversarial setting"); *see id.* (stating in the context of analyzing the Confrontation Clause that "[p]reviously we discussed the indicia of reliability that justified admitting this report into evidence"). Therefore, the reliability of the report can be inferred.

{38} Nevertheless, we will describe the procedure for blood collection that applied in this case and to cases similarly situated. We do so because government employees perform the procedure pursuant to their lawful responsibilities and duties and generate a report for use at trial, a report that is very probative of a defendant's guilt or innocence. Under these circumstances, we believe it is a valuable exercise to support the inference of reliability from a firmly rooted hearsay exception with a separate reliability analysis of the procedures actually utilized in preparing the report.

{39} The blood collection was performed using a blood kit provided by the SLD to the local police department. Typically, when blood kits are employed "the procedure for sampling blood is predictable and efficient." Nichols & Whited III, *supra,* § 23:7, at 23–6. Blood kits "reduc[e] the possibility of contamination without increasing medical risks, [and thus] provide better legal protection to the accused." *Id.* at 23–8. Specifically, blood kits generally contain a collection tube, which eliminates the need to transfer the sample from a syringe to a storage container. *Id.* at 23–7. Therefore, the blood is never exposed to air, which "greatly reduces the possibility of contamination, evaporation, or oxidation" of the sample. *Id.* Here, Officer Ashley testified the blood kit contained two collection tubes, and that he observed that the drawing of the blood was done using the contents of that kit.

{40} Another advantage of using a standardized blood collection kit is that there is less opportunity for the sample to be contaminated with alcohol antiseptics because the swab employed contains no alcohol or other organic solvent. *Id.* The record here reflects that an iodine (non-alcohol) swab was used during extraction. Furthermore, blood kits also contribute to an "improved preservation of the chain of custody." *Id.* Ordinarily, the kits remain sealed until an officer opens one for use on a particular person. *Id.* at 23–7 through –8. After the blood is drawn, the drawer then hands the tube containing the sample back to the officer. *Id.* at 23–8. The officer then places the tube inside the kit, which is then sealed and delivered to the lab. *Id.* The lab analyst receives the kit, breaks the seal, and initials the kit when the test is performed. *Id.* "Such routine documentation and protection of the identity of the sample more effectively preserves the chain of custody." *Id.*

{41} The record indicates that Officer Ashley received a sealed blood kit, proceeded to break the seals, and opened the kit which was then used to extract Defendant's blood. The record also reflects that after the blood was drawn, the nurse handed the tubes containing the sample back to Officer Ashley who then placed them back inside the kit. Officer Ashley also testified that he sealed the blood kit, which was taken back to the Gallup Police Department and then sent to

the SLD. Lucero testified that Defendant's blood kit was received via mail, and she was the person that received it. She further testified that the blood kit's seals were intact, she signed her name as the receiving employee, and she performed the blood alcohol test on Defendant's blood.

{42} Reliability "is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation." *Christian*, 119 N.M. at 779, 895 P.2d at 679 (quoting Fed.R.Evid. 803 advisory committee's note). Lucero testified that her duties as a forensic toxicologist included analyzing blood samples for alcohol level. Therefore, the record indicates that Defendant's blood alcohol results bore "indicia of reliability" in that they were obtained pursuant to a duty to make an accurate record.

{43} Lucero also stated that blood alcohol analysis was part of the regularly conducted business activity of the SLD. She testified that her particular laboratory received 2,000 blood samples for alcohol level analysis annually, there were four scientists at the lab, and each scientist worked on 500 to 600 samples per year. Lucero's testimony that her laboratory regularly and routinely performed blood alcohol tests in DWI cases is an additional indication of reliability, because it establishes that Defendant's blood results were obtained by "systematic checking" and by "regularity and continuity." *Christian*, 119 N.M. at 779, 895 P.2d at 679 (quoted authority omitted).

{44} There was no evidence that Defendant's blood alcohol report was prepared differently than any of the numerous other reports similarly situated or that there was any deviation from the normal practice. Moreover, the opponent of admissibility of a report has the burden to show that the report should be excluded for lack of trustworthiness. *Anaya v. N.M. State Pers. Bd.*, 107 N.M. 622, 627, 762 P.2d 909, 914 (Ct.App. 1988). There is no evidence that the blood alcohol report was untrustworthy, and neither party called into question the reliability of the procedures or the results reported.

The witnesses the State provided in its offer of proof had knowledge of the procedure and the manner in which Defendant's blood analysis was performed and were available for cross-examination as to these matters. The State has demonstrated the report had particularized guarantees of trustworthiness. The State has satisfied the second condition of the *Roberts* test.

## D

{45} We conclude that Defendant's right of confrontation provided no basis for exclusion of the blood alcohol report. We also conclude that ordinarily a blood alcohol report is admissible as a public record and presents no issue under the Confrontation Clause because the report is non-testimonial and satisfies the *Roberts* test.

## IV

{46} For the reasons stated above, we hold that the Court of Appeals erred by affirming the exclusion of the blood alcohol report on the basis that the "collection by veni-puncture" requirement was not met and that the trial court erred in excluding the report on Confrontation Clause grounds. We therefore reverse the Court of Appeals and remand this matter to the district court for further proceedings consistent with this opinion.

{47} **IT IS SO ORDERED.**

WE CONCUR: PETRA JIMENEZ MAES, Chief Justice, PATRICIO M. SERNA, RICHARD C. BOSSON, and EDWARD L. CHÁVEZ, Justices.