**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EDWARD L. MERAS,
             *Petitioner-Appellant,*

                   v.

D.K. SISTO; ATTORNEY
GENERAL OF THE STATE OF
CALIFORNIA,

             *Respondents-Appellees.*

No. 09-15399

D.C. No.
1:07-cv-00400-JMD

OPINION

Appeal from the United States District Court
for the Eastern District of California
John M. Dixon Jr., Magistrate Judge, Presiding

Argued and Submitted
November 15, 2011—San Francisco, California

Filed April 23, 2012

Before: Alex Kozinski, Chief Judge, Carlos T. Bea,
Circuit Judge, and Robert W. Gettleman, District Judge.*

Opinion by Chief Judge Kozinski;
Concurrence by Judge Bea

---

*The Honorable Robert W. Gettleman, Senior United States District
Judge for the Northern District of Illinois, sitting by designation.

**COUNSEL**

Barry L. Morris, Walnut Creek, California, for the petitioner-appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Brian G. Smiley, Supervising Deputy Attorney General, Daniel B. Bernstein (argued), Deputy Attorney General, Office of the California Attorney General, Sacramento, California, for the respondents-appellees.

## OPINION

KOZINSKI, Chief Judge:

Edward L. Meras, a California state prisoner, appeals the district court's order denying his petition for a writ of habeas corpus. He claims that testimony introduced during his trial violated his Sixth Amendment right to confrontation. He's probably right, but he loses anyway.

## Background

Intruders broke into Richard Peabody's home, stabbed him multiple times and stole property. Soon after, police found a bloodstained pair of blue jeans in Meras's apartment. Criminalist Jennai Lawson performed DNA analysis on the blood and produced a lab report concluding that it was Peabody's. Lawson testified at Meras's first trial, which ended in a hung jury. She was busy during Meras's second trial, so the state called her supervisor, Jill Spriggs, to testify to the contents of her report. Meras objected that Lawson's report was hearsay, and introducing it through Spriggs would violate his right to confront witnesses against him. The court overruled the objection, holding that the report was admissible under the business records exception to the hearsay rule, and allowed Spriggs to testify to its contents:

> Q. [D]oes the file reflect where Ms. Lawson got [the jeans] from?
>
> A. Yes, she got them from the freezer.
>
> Q. Great. Did she also receive blood samples associated with . . . Edward Meras and Richard Peabody?
>
> A. Yes.

> Q. And did she perform DNA typing analysis on those items of evidence?
>
> A. Yes.
>
> Q. And what were the results of the tests that she performed on those items?
>
> A. The . . . genetic profile, obtained from blood stains on the . . . jeans[, is] the same as Richard Peabody's.

The jury found Meras guilty of robbery, burglary and assault with a deadly weapon. He appealed the Confrontation Clause ruling, but the California Court of Appeal affirmed in a reasoned decision. *People* v. *Meras*, No. F044043, 2005 WL 1562735 (Cal. Ct. App. July 5, 2005) (unpublished). The California Supreme Court summarily denied review, and Meras did not file a petition for a writ of certiorari.

He did file a timely federal habeas petition, which the district court denied. *Meras* v. *Sisto*, No. 1:07-cv-00400-JMD-HC, 2009 WL 382641 (E.D. Cal. Feb. 13, 2009) (unpublished order). We granted a certificate of appealability as to "whether the trial court violated [Meras's] Sixth Amendment right to confrontation by admitting a non-testifying expert's lab report and/or extrajudicial statements into evidence."

**Analysis**

[1] We review the district court's decision de novo. *Doody* v. *Ryan*, 649 F.3d 986, 1001 (9th Cir. 2011) (en banc). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the district court was bound to reject Meras's Confrontation Clause claim unless the state court's adjudication resulted in a decision that either (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the

United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Meras relies on the former provision.

**[2] 1.** We must first decide what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States," for purposes of Meras's Confrontation Clause claim. *See Lockyer* v. *Andrade*, 538 U.S. 63, 71 (2003). Section 2254(d)'s "backward-looking language requires an examination of the state-court decision at the time it was made." *Greene* v. *Fisher*, 132 S. Ct. 38, 44 (2011) (internal quotation marks omitted). It "requires federal courts to focu[s] on what a state court knew and did," so "clearly established Federal law" includes only Supreme Court decisions "as of the time the state court renders its decision." *Id.* (internal quotation marks omitted) (emphasis and alteration in original); *see Nardi* v. *Pepe*, 662 F.3d 107, 110 (1st Cir. 2011) ("[O]nly Supreme Court precedent in effect at the time of the state court adjudication on the merits counts as 'clearly established Federal law . . . .' " (quoting *id.*)). The last state court adjudication on the merits of Meras's claim was that of the California Court of Appeal in 2005.

**[3]** Meras relies on three Supreme Court decisions: *Crawford* v. *Washington*, 541 U.S. 36 (2004), *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527 (2009), and *Bullcoming* v. *New Mexico*, 131 S. Ct. 2705 (2011). Of these, only *Crawford* was decided before the Court of Appeal affirmed Meras's conviction, so only *Crawford* constitutes "clearly established Federal law" for purposes of our review. *See Greene*, 132 S. Ct. at 44; *Nardi*, 662 F.3d at 110 ("[T]he only pertinent Supreme Court precedent that applied at the time of the [2008] decision affirming Nardi's conviction was *Crawford*.").

Meras argues that we can nevertheless rely on *Melendez-Diaz* and *Bullcoming* because their holdings were "dictated by

precedent existing at the time [his] conviction became final" and are therefore retroactive under *Teague* v. *Lane*, 489 U.S. 288, 301 (1989) (emphasis omitted). However, the Supreme Court recently explained that "the AEDPA and *Teague* inquiries are distinct. The retroactivity rules that govern federal habeas review on the merits—which include *Teague*—are quite separate from the relitigation bar imposed by AEDPA; neither abrogates or qualifies the other." *Greene*, 132 S. Ct. at 44 (internal citation and quotation marks omitted). Even if applying *Melendez-Diaz* and *Bullcoming* to Meras's claim would comport with *Teague*, doing so would contravene section 2254(d)(1) by "authoriz[ing] relief when a state-court merits adjudication resulted in a decision that *became* contrary to, or an unreasonable application of, clearly established Federal law." *Id.* (internal quotation marks omitted) (emphasis in original).

In *Greene*, the Supreme Court left open the question of "[w]hether § 2254(d)(1) would bar a federal habeas petitioner from relying on a decision that came after the last state-court adjudication on the merits, but fell within one of the exceptions recognized in *Teague*, 489 U.S. at 311." *Id.* at 44 n.*; *see Teague*, 489 U.S. at 311 ("[A] new rule should be applied retroactively if it places certain kinds of primary, private individual conduct beyond the power of the criminal law" or constitutes a "watershed rule[ ] of criminal procedure." (internal quotation marks omitted)). Meras doesn't argue that *Melendez-Diaz* or *Bullcoming* fell within one of *Teague*'s exceptions, so we express no view on the question left unanswered by Greene.

**[4] 2.** In *Crawford*, 541 U.S. at 54-55, the Supreme Court held that the Confrontation Clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." The Court of Appeal held that Lawson's lab report was not "testimonial" under *Crawford* and therefore did not trigger Meras's right to

confrontation. *Meras*, 2005 WL 1562735, at \*3. Meras must show that "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" *Crawford*. *Harrington* v. *Richter*, 131 S. Ct. 770, 786 (2011); *see also Bobby* v. *Dixon*, 132 S. Ct. 26, 27 (2011) (per curiam).

**[5]** Meras argues that forensic lab reports are testimonial because they're produced in anticipation of litigation. But *Crawford* didn't "clearly establish" such a rule. The Court identified "[v]arious formulations" that had been offered to define the "core class of 'testimonial' statements." *Crawford*, 541 U.S. at 51. One of these formulations included statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 52 (internal quotation marks omitted). But the Court did not adopt this formulation, or any other. It left "for another day any effort to spell out a comprehensive definition of 'testimonial,' " and held only that, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68. This left the term susceptible to a broad range of reasonable applications. *See Yarborough* v. *Alvarado*, 541 U.S. 652, 664 (2004). Indeed, the Court acknowledged that its "refusal to articulate a comprehensive definition [would] cause interim uncertainty." *Crawford*, 541 U.S. at 68 n.10.

**[6]** The question presented by Meras's claim—whether forensic lab reports are testimonial—"was exactly one of those areas of uncertainty." *Likely* v. *Ruane*, 642 F.3d 99, 102 (1st Cir. 2011). State and federal appellate courts divided sharply over the question until the Supreme Court resolved the split in *Melendez-Diaz*, 129 S. Ct. 2527. Some courts held that forensic lab reports were testimonial. *See State* v. *Johnson*, 982 So. 2d 672, 679-80 (Fla. 2008) (compiling cases). Many others disagreed, and had rational bases for doing so. For example, dicta in *Crawford* explained that the Confrontation Clause incorporated "those [hearsay] exceptions estab-

lished at the time of the founding. . . . Most of the[m] covered statements that by their nature were not testimonial—for example, business records . . . ." *Crawford*, 541 U.S. at 54 56; *see also id.* at 76 (Rehnquist, C.J., concurring in the judgment) ("To its credit, the Court's analysis of 'testimony' excludes at least some hearsay exceptions, such as business records and official records."). A number of courts therefore held that forensic lab reports were nontestimonial because they qualified as business records. *See, e.g.*, *United States* v. *De La Cruz*, 514 F.3d 121, 133 (1st Cir. 2008); *United States* v. *Ellis*, 460 F.3d 920, 925-26 (7th Cir. 2006); *Pruitt* v. *State*, 954 So. 2d 611, 616 (Ala. Crim. App. 2006); *Commonwealth* v. *Verde*, 827 N.E.2d 701, 705 (Mass. 2005); *State* v. *Forte*, 629 S.E.2d 137, 143 (N.C. 2006); *cf. State* v. *Thackaberry*, 95 P.3d 1142, 1145 (Or. Ct. App. 2004). These courts identified material differences between business records and the kinds of statements *Crawford* held to be testimonial—"prior testimony at a preliminary hearing, before a grand jury, or at a former trial" and "police interrogations." *Crawford*, 541 U.S. at 68. "Among other attributes, business records are neutral, are created to serve a number of purposes important to the creating organization, and are not inherently subject to manipulation or abuse." *Forte*, 629 S.E.2d at 143.

Courts further distinguished forensic lab reports from testimonial statements on the ground that the former are "not based on speculation, opinion, or guesswork, but instead [are] founded in scientific testing to determine the physical and chemical composition of the substance and the amount or quantity of the substance." *Pruitt*, 954 So. 2d at 617 (citing *Verde*, 827 N.E.2d at 705). "Although the report is prepared for trial, the process is routine, non-adversarial, and made to ensure an accurate measurement." *State* v. *Dedman*, 102 P.3d 628, 636 (N.M. 2004). Unlike testimonial statements, lab reports "are neutral, having the power to exonerate as well as convict." *Forte*, 629 S.E.2d at 143.

**[7]** When the Supreme Court eventually held that forensic lab reports are testimonial, four Justices vigorously dissented.

Writing on their behalf was Justice Kennedy, who was with the majority in *Crawford*. While continuing to believe *Crawford* was correctly decided, he wrote for the *Melendez-Diaz* dissenters that the majority "swe[pt] away an accepted rule governing the admission of scientific evidence" that had "been established for at least 90 years" and "extend[ed] across at least 35 states and six Federal Courts of Appeals." *Melendez-Diaz*, 129 S. Ct. at 2543 (Kennedy, J., dissenting). In the view of Justice Kennedy and those who joined him, *Crawford* "said nothing about scientific analysis or scientific analysts." *Id.* at 2555. Rather, *Crawford* addressed "formal statements made by a conventional witness—one who has personal knowledge of some aspect of the defendant's guilt." *Id.* at 2543. The dissenters saw crucial differences between the two: "First, a conventional witness recalls events observed in the past, while an analyst's report contains near-contemporaneous observations of the test. An observation recorded at the time it is made is unlike the usual act of testifying." *Id.* at 2551. "Second, an analyst observes neither the crime nor any human action related to it. Often, the analyst does not know the defendant's identity, much less have personal knowledge of an aspect of the defendant's guilt." *Id.* at 2552. "Third, a conventional witness responds to questions under interrogation. But laboratory tests . . . are not dependent upon or controlled by interrogation of any sort. . . . [T]hey are [not] produced by, or with the involvement of, adversarial government officials responsible for investigating and prosecuting crime." *Id.* (internal citation and quotation marks omitted).

**[8]** In light of the extensive, reasoned disagreement between the lower courts as to the question presented by Meras's claim, and between the Justices when they reached the issue, "we cannot say that the state court unreasonably applied clearly established Federal law." *Bailey* v. *Newland*, 263 F.3d 1022, 1032 (9th Cir. 2001); *see Thompson* v. *Battaglia*, 458 F.3d 614, 619 (7th Cir. 2006) ("The variety in practice among the state courts and the various federal courts

shows . . . that there is no standard clearly established by the Supreme Court of the United States . . . ."); *Likely*, 642 F.3d at 102 n.5 ("[T]hat four Justices dissented in *Melendez-Diaz* reaffirms that *Crawford* had not resolved the question *Melendez-Diaz* addressed."). We need not speculate as to whether "fairminded jurists could disagree that the" Court of Appeal's decision on Meras's claim involved an unreasonable application of *Crawford. Harrington*, 131 S. Ct. at 786 (emphasis added). They in fact did.

\* \* \*

**[9]** We therefore have a case here where the state court probably committed constitutional error, but we are not free to correct it. This is the nature and effect of AEDPA. *See Brown* v. *Payton*, 544 U.S. 133, 148-49 (2005) (Breyer, J., concurring) ("Were I a California state judge, I would likely hold that Payton's penalty-phase proceeding violated the Eighth Amendment. . . . Nonetheless, in circumstances like the present, a federal judge must leave in place a state-court decision . . . ."). The error could have been brought before the Supreme Court in a correctable posture, had Meras filed a cert petition after the California Supreme Court denied review in 2005. The case would have arrived at the Court nearly two years before *Melendez-Diaz*, and it's possible the Court would have granted cert and decided in Meras's case that forensic lab reports are testimonial. But *Melendez-Diaz* involved a lab report submitted without live testimony, whereas Meras's case has the added complication that the report was introduced through the testimony of the author's supervisor. The Court did not decide until 2011, in *Bullcoming*, that the right to confrontation could be satisfied only by the live testimony of a declarant. *See Bullcoming*, 131 S. Ct. at 2716 ("In short, when the State elected to introduce Caylor's certification, Caylor became a witness Bullcoming had the right to confront."). A properly phrased petition in Meras's case could have raised both issues, and it's not inconceivable that the Court would have granted cert and decided both, and perhaps

also resolved the question flagged by Justice Sotomayor's concurrence in *Bullcoming*. *See id.* at 2722 (Sotomayor, J., concurring in part) ("[T]his is not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue."). Meras does not challenge the effectiveness of his appellate counsel, so we have no occasion to decide whether failure to file a cert petition raising all of these issues was deficient or prejudicial.

**AFFIRMED.**

---

BEA, Circuit Judge, concurring in part and concurring in judgment:

I join the great majority of Chief Judge Kozinski's opinion, because it clearly comes to the correct conclusion under the deferential standard of review we are required to apply under AEDPA. But I cannot join the portions of the opinion at the beginning and the end where the majority ventures to determine, in what sounds to me very much to be de novo review, that Meras's constitutional rights were "probably" violated. *See* Op. 4320; 4327. Under 18 U.S.C. § 2254(d), we must determine only whether the California courts unreasonably applied federal law as determined by the Supreme Court. Raising the issue whether Meras's rights were *actually* violated is not part of this case. I therefore do not join the panel majority in its observation that Meras's constitutional Confrontation Clause rights were "probably" violated.

1.

As a matter of current constitutional law, it is clear after *Melendez-Diaz* that DNA reports like the one at issue here are "testimonial statements," and so a defendant has a Sixth Amendment right to confront in open court whoever carried

out the test, arrived at the result, and prepared the report prof-
fered as proof of the test and its result. That does not end the
matter, though. Were we reviewing this case de novo, we
would be faced with two additional, difficult questions
because there are two exceptions to the strict requirements of
the Confrontation Clause that may be applicable here. I dis-
cuss them briefly only to signal that the questions are difficult
and unresolved, and that I therefore do not think we can con-
clude that Meras's Confrontation rights "probably" were vio-
lated. I offer no answers to the questions.

First, the Supreme Court recognized an exception to the
general rule that a testimonial statement may not be admitted
into evidence absent the declarant's availability for cross-
examination. *Crawford v. Washington*, 541 U.S. 36, 54
(2004). The exception applies where the declarant is "unavail-
able to testify, and the defendant had a prior opportunity for
cross-examination." *Id.* Because Lawson, the criminalist who
prepared the report, testified at Meras's first trial, the second
prong of the exception has been met. The harder question is
whether Lawson was *constitutionally* "unavailable" for pur-
poses of the Sixth Amendment because she went to visit her
dying mother in the hospital rather than testify a second time
—at least, that is what an unsworn, uncross-examined prose-
cutor said in court.

The question is hard for two reasons. First, the Supreme
Court has rarely addressed what it means to be "unavailable"
for Confrontation Clause purposes. In the few cases it has
squarely answered this question, it has articulated a standard:
the prosecution must show it made a "good-faith effort" to
secure the testimony of a witness. *See Ohio v. Roberts*, 448
U.S. 56, 75 (1980). With the exception of one recent case
applying AEDPA's deferential standard of review,[1] the Court

---

[1] *See Hardy v. Cross*, 132 S. Ct. 490 (2011) (per curiam). Because of the
deferential standard of review the Court applied in that case, it did not go
into the specifics of what constitutes a "good-faith effort" for purposes of
the "unavailability" doctrine.

has not revisited the standard for constitutional unavailability in the wake of the change in Sixth Amendment doctrine brought about by *Crawford*. Further, the Court's primary "unavailability" cases have not addressed a case quite like this, where the absent witness's appearance at the retrial *had* been secured by the prosecution, but the witness then was absent from court on the day of her scheduled testimony because of a recent development: the hospitalization of the witness's mother.

The uncertain legal landscape is clouded by the incomplete factual record presented in this appeal. Neither party focused serious attention on the unavailability issue, so we know little about the circumstances leading up to Lawson's failure to testify. We have but one statement from the prosecutor that Lawson was unavailable because her "mother has cancer and is dying and had to be readmitted into the hospital." Were this statement the end of the matter, I admit the prosecution may not have met its burden to show it made a "good-faith" effort to secure Lawson's appearance. Yet we do not have the entire state court record on appeal. Were we actually addressing this issue on de novo review, we would need to know more about these circumstances to determine if this meets the test for constitutional unavailability. Was Lawson's mother in a hospital out of town, or nearby? Did the prosecutor know about her absence in advance? Did the prosecutor take any affirmative steps to try to compel or coax Lawson to testify, or did he quickly acquiesce and find Spriggs? How long would the trial have to have been postponed to accommodate Lawson? We do not know.

Second, and entirely independent of that question, Spriggs' testimony may also fall under a specific "supervisor" exception to *Crawford* identified by Justice Sotomayor in her concurrence in *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011). In that case, the prosecution had introduced into evidence the results of a blood test through the testimony of a colleague of the actual analyst, and the colleague who testi-

fied "had neither observed nor reviewed [the primary author's] analysis." *Id.* at 2712. The Court held this substitute testimony of this colleague was not the equivalent of the actual analyst's for purposes of the Confrontation Clause. *Id.* at 2710.

But Justice Sotomayor, who provided the fifth vote for the majority and wrote a separate concurrence, specifically observed that *Bullcoming* had a "limited reach" and was "not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." *Id.* at 2722 (Sotomayor, J., concurring). Whether that person may be permitted to testify in place of the report's primary author under the Confrontation Clause was therefore explicitly left open. *Id.*

Our case implicates that open question. Spriggs was Lawson's supervisor. She testified that she was "the one that technically reviewed the case notes for this case and signed as technical reviewer." *Bullcoming* did "not address what degree of involvement [with a report's preparation] is sufficient" to allow a supervisor to testify in place of the primary author, but Spriggs may have had enough involvement here to satisfy the Confrontation Clause. *Id.* at 2722; *see also* Op. 4327-28. Again: we do not know. The issue is unresolved.

2.

Were we reviewing this case de novo, we would be forced to answer those questions to determine if Meras's Confrontation Clause rights were violated. The ultimate resolution of these legal questions will be important in the wake of *Crawford*, a "landmark decision" that drastically changed the landscape of the Confrontation Clause. *Ocampo v. Vail*, 649 F.3d 1098, 1107 (9th Cir. 2011). But, especially given the incomplete record on appeal, today is not the day to decide these difficult questions, nor even to hint at their ultimate resolution. Congress has required us to decide this case under the

deferential standard created by AEDPA, whereby we determine whether the state court's decision, at the time it was rendered, "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"—not whether it was correct. 18 U.S.C. § 2254(d)(1). In habeas cases, just as in every case we decide, we should remember the "cardinal principle of judicial restraint": "if it is not necessary to decide more, it is necessary not to decide more." *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment).

To be sure, the majority does not explicitly "decide" these questions, but rather it says that Meras's Sixth Amendment rights "probably" were violated. The trouble with saying this in an opinion is that the *Federal Reporter* is not the same thing as a law review. The latter, not the former, is the appropriate venue for speculation as to how hypothetical legal questions would be resolved. After all, the majority's statement, in a published opinion, that Meras's rights were "probably" violated will have ramifications in future cases that we or other courts will have to decide some day. When that future case is before a court, a nice quotation from a Ninth Circuit opinion can provide powerful ammunition for lawyers, even if the quotation is dicta. This is especially important to us because dicta, in the Ninth Circuit, can have precedential effects. *See McOmie-Gray v. Bank of Am. Home Loans*, 667 F.3d 1325, 1329 (9th Cir. 2012).[2]

---

[2]Expressing an opinion on whether some action "probably" violated the Constitution were there to be a de novo review could even affect the outcome of future § 1983 actions. Our case likely will not have such effects, since prosecutors are absolutely immune from suit for their conduct "in presenting the State's case" in court. *See Burns v. Reed*, 500 U.S. 478, 486 (1991). However, if our court were to get into the business of saying what we thought of the de novo merits of every AEDPA case, that could affect a subsequent decision addressing whether a right was "clearly established" for qualified immunity purposes. As the Supreme Court has said in the context of evaluating § 1983 claims where defendants are entitled to

In sum, I fully agree that the California courts did not unreasonably apply Sixth Amendment law here, and therefore I concur in the judgment of the court to affirm denial of the writ. I cannot agree, however, that we should express any opinion at all on the unresolved questions that are also addressed by the majority.

---

qualified immunity, venturing an opinion on the de novo merits when doing so is not necessary to the ultimate disposition "comes at a price": the "substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case" and the "risk of bad decisionmaking." *Pearson v. Callahan*, 555 U.S. 223, 236, 239 (2009).