# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2020-NMCA-043**

**Filing Date: May 18, 2020**

**No. A-1-CA-37169**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**SANTIAGO MARTINEZ,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF RIO ARRIBA COUNTY**
**Jennifer L. Attrep, District Judge**

Certiorari Denied, June 23, 2020, No. S-1-SC-38355. Released for Publication October 6, 2020.

Hector H. Balderas, Attorney General
Santa Fe, NM
Margaret Crabb, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**VANZI, Judge.**

**{1}** Defendant Santiago Martinez appeals his convictions for (1) homicide by vehicle (driving while under the influence of drugs), contrary to NMSA 1978, Sections 66-8-101(A), -102(B) (2016); (2) great bodily harm by vehicle (driving while under the influence of drugs), contrary to Sections 66-8-101(B), -102(B); (3) possession of drug paraphernalia, contrary to NMSA 1978, Section 30-31-25.1(A) (2001, amended 2019);

and (4) possession of marijuana, contrary to NMSA 1978, Section 30-31-23(A) (2011, amended 2019). Defendant raises three issues: (1) the admissibility of expert testimony concerning Defendant's alleged impairment; (2) the admissibility of Defendant's blood test results in evidence; and (3) the sufficiency of the evidence to sustain Defendant's convictions. We affirm.

## BACKGROUND

{2}     Defendant's convictions arise from a tragic motor vehicle collision on Highway 64, near Dulce, New Mexico, on June 16, 2014. On February 15, 2015, Defendant was indicted by grand jury on charges of homicide by vehicle (driving while under the influence of drugs), great bodily harm by vehicle, possession of drug paraphernalia, and possession of a controlled substance (marijuana). Defendant's trial commenced on June 20, 2017, and concluded on June 22, 2017. We summarize the evidence presented at trial regarding the collision and investigation, and the opinion of the State's expert as to whether Defendant was impaired and therefore unable to drive safely at the time of the collision.

### The Accident

{3}     It was a sunny, clear afternoon, around 4:00 p.m., and Defendant and his girlfriend, Lindsay Hinds, were headed southeast on Highway 64 in Ms. Hinds' white Mercedes sedan. Defendant was driving, and Ms. Hinds was in the passenger seat. Headed northwest (in the opposite lane of travel) was Lylon Vigil, who was driving a GMC pickup truck. Ms. Vigil was driving slightly under the speed limit, and behind her were a dark SUV, followed by another pickup truck towing an RV. Emergency room physician Paul Mikkelson, M.D., was driving the pickup truck, and his partner, Sarah Yurkovich, a registered nurse, was in the passenger seat. Dr. Mikkelson, Ms. Yurkovich, and Ms. Vigil testified at trial regarding the collision.

{4}     According to Dr. Mikkelson, the line of vehicles had just come over a rise when the collision occurred. The dark SUV had pulled out as if to pass Ms. Vigil's pickup truck, but then moved back into the line of cars, and tapped its brakes. At this point, Dr. Mikkelson "backed off," to give the SUV and the truck some additional space. Then, Dr. Mikkelson saw a white sedan in the oncoming southeast-bound lane turn suddenly into the northwest-bound lane, colliding head-on with Ms. Vigil's pickup truck. Dr. Mikkelson testified that the dark SUV immediately in front of him swerved to the right, onto the shoulder, and Dr. Mikkelson swerved to the left.

{5}     Ms. Yurkovich testified that she had a clear view down the road after traveling over the rise. Before the collision, Ms. Yurkovich observed the white sedan weaving onto the shoulder, then over the center line, and then back into its lane. She commented about this to Dr. Mikkelson, because the movements of the approaching white sedan "alarmed" her. The white sedan then veered head-on into the pickup truck ahead of them. When asked about whether she saw the SUV pulling out to pass at

some point prior to the collision, Ms. Yurkovich stated that she had no specific recollection of it, and that her attention was focused on the white sedan.

{6}     Ms. Vigil also testified that the collision occurred just after cresting a small hill. Ms. Vigil had no recollection of any vehicle pulling out to pass. According to Ms. Vigil, the white sedan suddenly appeared on Ms. Vigil's side of the road as Ms. Vigil descended from the hill, and there was no way to avoid a head-on collision. Both Ms. Vigil and Ms. Yurkovich testified that the roadway was clear of obstructions prior to the collision and that there was no other traffic on the road.

{7}     After the collision, Dr. Mikkelson pulled over, and he and Ms. Yurkovich checked on the occupants of the two vehicles. A number of passing motorists stopped to assist and call for help, but there was poor cellular reception in the area, and emergency services did not arrive on the scene for twenty to thirty minutes. Dr. Mikkelson and Ms. Yurkovich first checked the white sedan, and saw that Ms. Hinds was not wearing a seat belt and was slumped in her seat, unresponsive, and struggling to breathe. Dr. Mikkelson and Ms. Yurkovich opened Ms. Hinds' airway, and (with the assistance of a few others) carefully removed Ms. Hinds from the vehicle, but Ms. Hinds succumbed to her injuries—blunt trauma to the head and chest—within minutes. The autopsy revealed that Ms. Hinds had 2 nanograms per milliliter of THC[1] in her blood. Defendant, who was wearing his seatbelt, was slumped over, apparently unconscious and motionless, initially. Soon, however, he regained consciousness and began moaning, expressing confusion, and complaining of pain in his abdomen. Other motorists assisted in lifting Defendant out of the vehicle. Ms. Yurkovich then checked on Defendant, and stayed with him for ten to fifteen minutes, during which time Defendant was holding his belly and continuing to complain of pain, but was stable and responsive, as far as Ms. Yurkovich could discern.

{8}     Ms. Vigil was conscious after the impact of the collision, but was in great pain and had difficulty breathing or moving. With Dr. Mikkelson's assistance and direction, other motorists helped remove Ms. Vigil from the GMC truck, via the passenger-side door. Dr. Mikkelson testified that Ms. Vigil appeared to be stable, though she complained of chest and belly pain.

{9}     When asked if, while he was at the scene, Dr. Mikkelson or others had gone through or moved the items in the white sedan, Dr. Mikkelson stated that he and Ms. Yurkovich looked through a small wallet that they found near Ms. Hinds, to see if they could identify her, but otherwise didn't touch anything. Dr. Mikkelson also testified that he didn't see bystanders move or remove anything. Ms. Yurkovich testified that she noticed two small syringes containing a brown residue in the white sedan, which had various items scattered around the interior. She did not move anything and did not see anyone else move anything in the vehicle.

{10}    The first police officers arrived at the scene five or ten minutes after EMS. New Mexico State Police, the Rio Arriba Sheriff's Office, and the Jicarilla Apache Police

---

[1]THC, or Delta-9-Tetrahydrocannabinol, is the principal psychoactive constituent of marijuana.

Department all dispatched officers, but the Rio Arriba Sheriff's Office led the investigation. Sergeant Gilbert Atencio of the Rio Arriba Sheriff's Office conducted the scene investigation, and testified that there were no skid marks, brake marks, or other evidence indicating that the white sedan had swerved or attempted to avoid either an obstruction or the collision with the GMC truck. Sergeant Atencio further testified that an accident reconstruction was not necessary because the "cause" of the collision was "obvious": the white sedan crossed over the center line and collided with the GMC pickup truck.

{11}    Major Matthew Vigil, also of the Rio Arriba Sheriff's Office, investigated whether there was any evidence that either driver was impaired by a substance at the time of the collision. Major Vigil made contact with Lylon Vigil, who had not yet departed with EMS, and observed nothing suspicious for substance abuse. Defendant had already departed with EMS, so Major Vigil began photographing the white sedan, when he noticed a "heavy odor of raw marijuana" emanating from the vehicle. He saw two electronic cigarettes (e-cigarettes): one in the driver's side door, and one on the driver's side floorboard. He also observed marijuana wax, a substance commonly smoked in e-cigarettes, in the vehicle. Sergeant Atencio also visually inspected the white sedan, and saw two syringes in the passenger seat, both of which contained a brownish-orange substance. Sergeant Atencio suspected that the substance was heroin, and determined that he should seek a search warrant for the vehicle; accordingly, he sealed the vehicle off with evidence tape. He also recalled a "very faint" odor of marijuana, but testified that he was focused on the syringes. Sergeant Atencio requested that the State Police intercept Defendant at the hospital to see if he displayed signs of impairment and to obtain a blood sample.

{12}    Following the issuance of a search warrant, Sergeant Atencio and Major Vigil searched the white sedan and recovered (1) a glass smoking pipe with THC residue, found in the trunk; (2) nine syringes containing THC, and two jars containing a liquid tar substance, found in the trunk; (3) a green leafy substance containing THC, found in the trunk; (4) two small syringes with an orange-brown substance, containing THC, and a little vial, all found on the passenger seat; (5) a purple pill container containing nine tablets of alprazolam, otherwise known as Xanax, a benzodiazepine; (6) a black digital scale in the center console of the sedan; (7) a silver grinder found in the driver's side door compartment; (8) a package of a green leafy substance containing THC found in the driver's side door compartment; (9) an e-cigarette found in the driver's side door compartment; (10) a mouth piece and cylinder from an e-cigarette found in the driver's side door compartment; and (11) an e-cigarette found on the driver's side floor board. Sergeant Atencio testified that he learned the vehicle was registered to Ms. Hinds and he returned to her family the items not taken as evidence.

**The Blood Test**

{13}    Both Ms. Vigil and Defendant were taken by helicopter to San Juan Regional Medical Center for treatment. Ms. Vigil testified that her right foot was crushed, and she suffered a concussion and six cracked ribs as a result of the collision. New Mexico State

Police Officer Tayna Benally was waiting for Defendant upon his arrival at the hospital to arrange for the blood draw requested by Sergeant Atencio. At approximately 7:00 p.m., after Defendant had been attended to by nurses for thirty minutes, Officer Benally was able to speak with Defendant and ask him what happened. Officer Benally testified that she was able to understand Defendant after some initial difficulty. Officer Benally testified that Defendant was evidently in pain, in a neck brace, and had blood on his face. Officer Benally asked Defendant if he was traveling alone, or if he had any passengers; he answered that he had a passenger, but did not give "a name." When asked if Defendant made any "admissions" as to "substance use," Officer Benally testified that Defendant told her that he "had one shot of 99 Bananas at the time." Defendant had bloodshot, watery eyes, and Officer Benally attempted to perform a horizontal gaze nystagmus (HGN) field sobriety test, but was unable to perform the test. Officer Benally then read Defendant the "New Mexico Implied Consent Advisory" and Defendant verbally agreed to a blood test. Officer Benally had to ask Defendant to open his eyes in order to sign the accompanying form.

{14}    Officer Benally had brought with her a blood kit approved by the New Mexico Department of Health State Toxicology Bureau's Scientific Laboratory Division (SLD). Officer Benally testified that an SLD-approved blood draw kit includes two vials; a needle; forms listing the individual's name, date of birth, any witnesses, and a certification for the nurse; the Implied Consent form; tags to seal the vials; and bubble wrap in which to place the vials within the kit. The nurse was unable to get blood into the vial using the first kit, so Officer Benally had to "get another kit," which she described as "the same . . . box, with the same vials, and the needles and the forms and everything." The nurse drew Defendant's blood at about 8:00 p.m., which Officer Benally witnessed. On cross-examination, Officer Benally conceded that, in the certification accompanying the blood draw kit, the nurse had apparently crossed out the sentence that the blood had been drawn using the "entire contents of . . . [the] kit," but Officer Benally could not say why the nurse had done this. Officer Benally stated that she tagged and sealed the package after the nurse drew Defendant's blood, to ensure that the kit was not tampered with, and provided Defendant's blood sample to Officer Aaron Julian of the Rio Arriba Sheriff's Office.

{15}    Because of Officer Benally's testimony, mid-trial, defense counsel filed a motion to exclude Defendant's blood test results from evidence, both because the test was not administered within three hours of driving (citing 7.33.2.15(A)(2) NMAC) and because the State failed to show that the test kit used was SLD-approved, as required by 7.33.2.15(A)(3) NMAC. The district court initially reserved ruling on the motion, noting that other witnesses on the State's witness list might be able to provide more information as to whether the kit used complied with SLD requirements. Subsequently, the State's toxicology expert, Protiti Sarker, staff manager and chemist at the SLD, testified that she had seen the nurse's certification in Defendant's blood kit, and the crossed-out language, but that the nurse had also added a note indicating that she used a smaller needle, a "butterfly 21 GA and vacuum meter" rather than the needle included in the kit. Ms. Sarker testified that sometimes nurses taking blood samples with an SLD kit use a different needle from the needle in the kit, as the needle in the kit may be too

large. Ms. Sarker testified that there was no reason to believe that any other aspect of the kit had not been used, as it is standard procedure for the SLD analyst to note any irregularities, and there were none in this case. Ms. Sarker also testified that the SLD would not accept a blood test kit if there was "something wrong with the kit."

**{16}** Following Ms. Sarker's testimony on these issues, the district court denied Defendant's motion, concluding that there was no evidence that strict compliance regarding use of the needle in the SLD blood kit was required to ensure the accuracy of the sample, and cited Ms. Sarker's testimony that the SLD would not have accepted the blood sample had the kit failed to meet SLD requirements. The district court also held that the passage of more than three hours between the collision and the blood test was relevant as to the weight of the evidence, but did not render the blood test results inadmissible, citing NMSA 1978, Section 66-8-110(E) (2007), and *State v. Bowden*, 2010-NMCA-070, ¶ 1, 148 N.M. 850, 242 P.3d 417.

**Expert Opinion Testimony of Ms. Sarker**

**{17}** The State also offered Ms. Sarker as an expert qualified to testify regarding Defendant's blood toxicology results, and as to whether Defendant was impaired by drugs at the time of the collision, such that he was unable to safely operate a vehicle. Defense counsel objected to Ms. Sarker's expertise to offer testimony concerning the effects of drugs on human behavior and, specifically, the ability to operate a vehicle. Following voir dire, and direct questioning by the district court, the court found that Ms. Sarker was so qualified, citing, among other things, Ms. Sarker's bachelor's and master's degrees in pharmacy; her work at the SLD for eleven years as an advanced chemist and staff manager; her professional coursework on the effects of drugs on human performance and driving behavior, including a forty-hour course that she completed twice (in 2007 and 2016); her reliance upon the same studies relied upon by other experts in the field; and her previous qualification, on over thirty occasions, as an expert in the same area. The district court also generally found that Ms. Sarker's testimony would be of assistance to the jury, and that it had a reliable basis, citing Rule 11-702 NMRA, and *State v. Downey*, 2008-NMSC-061, ¶ 25, 145 N.M. 232, 195 P.3d 1244.

**{18}** Ms. Sarker testified regarding the process of testing blood samples for drug and alcohol content, and her review of the data produced by the chemical analysis of Defendant's blood. Defendant's blood test revealed the presence of 0.04 milligrams per liter of alprazolam; 0.05 milligrams per liter of oxycodone, and 3 nanograms per milliliter of THC. The levels of oxycodone and alprazolam in Defendant's blood were within the relevant therapeutic ranges. Ms. Sarker testified that, although alprazolam is a central nervous system depressant drug, prescribed for anxiety, and oxycodone is an analgesic pain medication, both have central nervous system depressant effects. She explained that these effects include drowsiness or sleepiness and slower reaction time and reflexes. Ms. Sarker also noted that, while THC is a psychoactive drug not categorized as either a depressant or stimulant, it can have both depressant and stimulant effects

on the central nervous system. Moreover, oxycodone, alprazolam, and THC ingested in combination produce an additive effect.

{19}    When asked about the effects of these drugs on a person's driving ability, Ms. Sarker stated that blood levels alone are not adequately informative because the strength of the effect of any drug depends upon individualized factors, such as a person's metabolism, how long a person has used the drug, a person's sensitivity to particular effects of a given drug, and so forth. Ms. Sarker explained that, in order to determine whether a person was experiencing certain effect(s) of a drug or drugs at the relevant time, she considers other factors from the police reports, such as driving behavior, and the results and observations from field sobriety tests. On direct examination, Ms. Sarker discussed Defendant's behavior at the hospital following the accident, as described in the police report. Specifically, she testified that, during the attempted field sobriety test, Defendant was unable to keep his eyes open to take the test, consistent with the depressant effects of the drugs that were found in Defendant's blood. Ms. Sarker was then asked whether, based on the "additive effect" of the drugs in issue, and her analysis of the "raw data," it was her opinion that Defendant was "impaired to the extent that he was not able to drive safely" at the time of the accident, to which Ms. Sarker answered "yes."

{20}    On cross-examination, Ms. Sarker confirmed that she could not form an opinion about impairment based on the concentration of a drug in the individual's blood, alone, without more information. Ms. Sarker acknowledged that, here, she did not have any information outside of the police reports. She had no information about Defendant's metabolism, tolerance, or history of drug use, nor did she have any information from his medical records, either prior to the accident, or relating to the accident. Ms. Sarker acknowledged that she did not know what if any drugs were administered by emergency medical personnel in the hours between the collision and the blood test. Ms. Sarker reiterated that she found significant Defendant's reported inability to open his eyes, such that Officer Benally was unable to perform the field sobriety "eye tests." When asked what if any injuries Defendant was suffering from at the time of the attempted "eye tests," Ms. Sarker acknowledged that she did not know. Ms. Sarker agreed that, if Defendant suffered a head injury, that would probably explain his inability to open his eyes in the emergency room, but added that she is not a physician, and that she could only say that his symptoms were consistent with the effects of central nervous system depressants.

{21}    Ms. Sarker further testified on cross-examination that, even if the oxycodone was administered at the hospital, it was her opinion that Defendant was impaired by the additive effects of alprazolam and THC at the time of the accident, based on his driving behavior. She initially agreed that her opinion "really [came] down to" the "fact that there was an accident," but then qualified that statement, reiterating the significance of the totality of the circumstances, including Defendant's drowsiness at the hospital, the toxicology results, and Defendant's driving behavior. Ms. Sarker agreed that her "issue" with Defendant's driving at the time of the collision was his "reaction time," but she was not asked to explain the significance of the circumstances of the accident with respect

to reaction time. As to the cause of the accident, Ms. Sarker testified that her understanding from the police reports was that Defendant had "merged into the lane and hit the vehicle in front of [him]."

**{22}**    Following Ms. Sarker's testimony, defense counsel moved for a directed verdict, which the district court denied. Defendant put on no evidence. The jury convicted Defendant on all four counts: (1) homicide by vehicle (driving while under the influence of drugs); (2) causing great bodily injury (driving while under the influence of drugs); (3) possession of drug paraphernalia; and (4) possession of marijuana. Defendant appeals.

## DISCUSSION

**{23}**    Defendant raises three issues on appeal. First, he argues that the district court abused its discretion in admitting the opinion of the State's toxicology expert, Ms. Sarker, whose opinion, he contends, was "unmoored from the facts of the case" and therefore unreliable and inadmissible. Second, he argues that the district court abused its discretion in admitting Defendant's blood test results, because the State failed to lay a proper foundation, both because the blood test kit was not shown to be "SLD-approved," and because the blood was collected approximately four hours after the accident. Finally, he argues that the State failed to present sufficient evidence to sustain the convictions.

**{24}**    We first address Defendant's second argument, concerning the blood test results, given that Ms. Sarker's opinion relied, in part, upon those results. Next, we address the admissibility of Ms. Sarker's testimony. Last, we address Defendant's argument concerning the sufficiency of the evidence to sustain the convictions.

## Blood Test Results

**{25}**    We review alleged errors in the admission or exclusion of evidence under an abuse of discretion standard. *State v. Martinez*, 2007-NMSC-025, ¶ 7, 141 N.M. 713, 160 P.3d 894. This generally means that a district court's evidentiary ruling "will be disturbed on appeal only when the facts and circumstances of the case do not support its logic and effect." *Id.* (alteration, internal quotation marks, and citation omitted). However, where the district court admits evidence lacking a foundation, it abuses its discretion. *See State v. Gardner*, 1998-NMCA-160, ¶ 5, 126 N.M. 125, 967 P.2d 465. We review questions of law related to foundational requirements, and the district court's application of the law, de novo. *See Bowden*, 2010-NMCA-070, ¶ 9.

**{26}**    Defendant argues that, because there was insufficient evidence that an SLD-approved kit was used to collect his blood, the State failed to lay the requisite foundation for admission of his blood test results. The State counters that there was evidence of the kit's conformance to SLD requirements in all respects, except that a "butterfly" needle was used, rather than the standard needle included in the kit. Moreover, according to the State, there was no evidence that a butterfly needle

compromises the accuracy of a blood sample, accuracy being the touchstone of admissibility. We agree with the State.

**{27}** The administration and use of chemical tests in cases involving charges of driving while intoxicated (DWI) are governed by criminal statutes, including New Mexico's Implied Consent Act (ICA), and regulations promulgated by the SLD. *See* NMSA 1978, §§ 66-8-101 to -141 (1953, as amended through 2019); 7.33.2 NMAC. As discussed by our Supreme Court in *State v. Dedman*, these provisions require the state to show, for any chemical test result sought to be admitted in evidence, that the test complied with the accuracy-ensuring aspects of SLD regulations. *See* 2004-NMSC-037, ¶ 13, 136 N.M. 561, 102 P.3d 628, *overruled on other grounds by State v. Bullcoming*, 2010-NMSC-007, ¶ 16, 147 N.M. 487, 226 P.3d 1. The State does not, however, need to show compliance with regulations that are *not* accuracy-ensuring. *See Martinez*, 2007-NMSC-025, ¶ 11 (reiterating *Dedman*'s holding that "to meet foundational requirements, the [s]tate does not need to show compliance with all regulations, but only with those that are 'accuracy-ensuring' ").

**{28}** By way of illustration, in *Dedman*, our Supreme Court considered whether the defendant's blood test results lacked the proper foundation, where the state failed to prove that the defendant's blood-alcohol test had been administered via venipuncture, as required by 7.33.2.15(A)(1) NMAC. *See Dedman*, 2004-NMSC-037, ¶¶ 4-6.[2] Examining various methods for drawing blood (including venipuncture, arterial puncture, and skin puncture), our Supreme Court concluded that "the reason for collection through veni[]puncture is not a higher probability of accuracy. Instead, veni[]puncture is the preferred method for collecting blood alcohol samples from adults because extraction is easier, less hazardous, and less painful when conducted through the vein." *Dedman*, 2004-NMSC-037, ¶¶ 14-20. Accordingly, our Supreme Court held that "compliance with the 'collection by veni[]puncture' requirement is not a prerequisite to the admissibility of blood alcohol reports." *Id.* ¶ 21. By contrast, in *Martinez*, our Supreme Court held that the SLD requirement (in 7.33.2.11(A)-(B) NMAC) that "breath-alcohol testing equipment be certified by SLD for a period of up to one year" and related requirements, "clearly exist to ensure that the result of a test conducted on a breathalyser is accurate." *Martinez*, 2007-NMSC-025, ¶¶ 11-12. Thus, before a breath alcohol test card "is admitted into evidence, the [s]tate must make a threshold showing that the machine has been certified." *Id.* ¶ 12.

**{29}** SLD regulations with respect to blood sample collection for purposes of toxicology screening provide in part:

> The samples shall be dispensed or collected using an SLD-approved blood collection kit. SLD-approved blood collection kit will contain two or more sterile tubes with sufficient sodium fluoride so that the final concentration shall contain not less than 1.0 percent sodium fluoride.

---

[2] The SLD regulations were amended in 2010; when Dedman was decided in 2004, the regulation regarding venipuncture, now located at 7.33.2.15(A)(1) NMAC, was located at 7.33.2.12(A)(1) NMAC (2001), which was repealed. *See Dedman*, 2004-NMSC-037, ¶ 4.

7.33.2.15(A)(3) NMAC. Defendant argues that this regulation requires the State to prove that the entire SLD-approved kit was used, as a predicate to admissibility, to ensure the accuracy of any blood sample, quoting our language from *State v. Garcia*, 2016-NMCA-044, ¶ 4, 370 P.3d 791, in which we described an SLD-approved blood draw kit as "includ[ing] everything that is needed for a blood draw to ensure continuity and standardization, and to avoid compromising the accuracy and integrity of blood samples. The kits contain instructions, paperwork, an iodine cleaning pad, a needle with attached tube, and two gray-topped, sterile vacuum tubes containing sodium fluoride—a white powder preservative." Here, Defendant contends, because Officer Benally "was unable to say" whether the kit used by the nurse was an SLD-approved kit, the State failed to lay the requisite foundation. We disagree with Defendant's characterization of the evidence, and his contention that, in effect, every piece of the SLD-approved kit must be utilized to ensure the accuracy, and therefore admissibility, of blood samples.

**{30}**    First, Officer Benally testified that the blood collection kit used by the nurse was "the same" as the kit that Officer Benally had brought with her initially, and Officer Benally was able to describe the contents of the kits in detail. If the second kit was not an SLD-approved kit, it is also unclear why it included the standard tags and the SLD forms filled out by Officer Benally. Moreover, a note next to the nurse's certification (entered in evidence by defense counsel) explained the crossed-out language as to the "entire contents" of the (second) kit having been used: the nurse substituted a "butterfly" needle for the needle included in the kit. A butterfly needle, also known as a "winged set," is a venipuncture method recommended for small veins, the elderly, or children. *See, e.g.*, Geneva: World Health Organization, *WHO Guidelines on Drawing Blood: Best Practices in Phlebotomy*, Ch. 3.2, Table 3.1 (2010), https://www.ncbi.nlm.nih.gov/books/NBK138650/. According to Ms. Sarker, a staff manager familiar with the standards and procedures of the SLD, use of a "smaller" needle, rather than the needle included in the kit, is not uncommon. Thus, the district court's finding that an SLD-approved kit was used, but for the substitution of the butterfly needle for the standard needle, was supported by the facts and circumstances of the case.

**{31}**    Second, the quoted language from *Garcia*—that SLD kits contain everything necessary "to avoid compromising the accuracy and integrity of blood samples"—was our description of the testimony in that case; we expressly did *not* decide whether the blood test result should have been excluded because "the protocols and contents of the SLD blood draw kit were not followed and used." 2016-NMCA-044, ¶¶ 4, 24. Furthermore, even though the regulation states that blood samples "shall be collected" using an "SLD-approved blood collection kit," such mandatory language was also used in the regulation at issue in *Dedman*. 7.33.2.15(A)(3) NMAC; *see Dedman*, 2004-NMSC-037, ¶¶ 4, 21 (noting that 7.33.2.12(A)(1) NMAC (2001) requires blood samples to be collected by venipuncture). The question is whether the mandate goes to accuracy, or to other factors, such as ease of administration or the safety and comfort of the subject of the blood draw.

**{32}** If *Dedman* held that proof of the use of venipuncture as the method of drawing a blood sample is not a prerequisite for admissibility, it would be contradictory for us to hold that a particular *method* of venipuncture—i.e., use of the needle included in the standard SLD-approved kit—is a prerequisite for admissibility, absent evidence that other methods are less reliable.[3] Defendant did not make this showing, nor any argument to this effect. We further note that the regulation at issue states that SLD-approved kits "will contain two or more sterile tubes with sufficient sodium fluoride so that the final concentration shall contain not less than 1.0 percent sodium fluoride[,]" but does not specify which needle should be included in the kit. 7.33.2.15(A)(3) NMAC. Presumably, if a particular method or needle-type were critical to ensuring the accuracy of a blood sample, the regulation would list it explicitly, as it does by listing the required tubes and preservative concentration. In sum, in the absence of evidence or regulatory guidance to the effect that the needle included in SLD-approved blood draw kits is accuracy-ensuring, rather than a common and convenient needle for venipuncture blood draws, the district court did not err in finding that the use of a butterfly needle was not a basis upon which to exclude Defendant's blood test result from evidence.

**{33}** Defendant argues that the district court also erred in admitting his blood test results in evidence because his blood was collected approximately four hours after the collision, and SLD regulations provide that "[t]he initial blood samples should be collected within three hours of arrest." 7.33.2.15(A)(2) NMAC. Defendant emphasizes that, based on our decision in *Bowden*, 2010-NMCA-070, ¶¶ 6-7, this regulation is "accuracy-ensuring," and therefore the State must demonstrate compliance with the regulation as a precondition to admissibility of the blood test result. The State counters that the ICA supersedes this regulation, permitting admission in evidence of test results collected more than three hours after the arrest, with the "trier of fact" to "determine what weight to give the test result," Section 66-8-110(E), also citing (as did the district court) our holding in *Bowden*, 2010-NMCA-070, ¶¶ 8-12. Defendant replies that the ICA provision explicitly applies to *blood-alcohol tests only*; therefore, the regulation governs. A closer examination of the relevant statutes and the SLD's amended regulatory scheme convinces us that 7.33.2.15(A)(2) NMAC does not mandate per se exclusion of all chemical tests administered more than three hours after arrest. We explain.

**{34}** Our de novo interpretation of the DWI statute, the ICA, and SLD regulations is guided by longstanding principles, the most important of which is to give effect to the intent of the Legislature and/or promulgating agency. *See State v. Torres*, 2006-NMCA-106, ¶¶ 5, 8, 140 N.M. 230, 141 P.3d 1284; *see also State v. Willie*, 2009-NMSC-037, ¶ 9, 146 N.M. 481, 212 P.3d 369 (applying principles of statutory interpretation to SLD regulations under de novo standard of review). "[I]n determining intent we look to the language used and consider the statute's history and background." *Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶ 13, 121 N.M. 764, 918 P.2d 350. When the words used are plain and unambiguous, we give a statute its literal reading, unless that reading would lead to an injustice, absurdity, or contradiction, in which case "we will construe the statute according to its obvious spirit or reason." *Willie*, 2009-NMSC-037, ¶

---

[3]We note that, when *Dedman* was decided in 2004, the SLD regulations contained the same provision requiring use of an SLD-approved blood kit, then located at 7.33.2.12(A)(3) NMAC (2001).

9 (internal quotation marks and citation omitted); *see Torres*, 2006-NMCA-106, ¶ 8. Moreover, we consider the provision(s) at issue "in the context of the statute as a whole," including its purposes and consequences. *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 15, 309 P.3d 1047.

**{35}** The ICA establishes a framework for chemical testing of persons suspected of DWI, such that "[a]ny person who operates a motor vehicle" in New Mexico is deemed to have consented "to chemical tests of his breath or blood," with such testing processes to be approved by the SLD. Section 66-8-107(A). The SLD is separately authorized to "promulgate and approve satisfactory techniques or methods to test persons believed to be operating a motor vehicle . . . under the influence of drugs" and to "establish criteria and specifications for equipment, training, quality control, testing methodology, blood-breath relationships and the certification of operators, instructors and collectors of breath samples." NMSA 1978, § 24-1-22(A), (B) (2003). The SLD promulgated these regulations in 7.33.2 NMAC. Under the ICA, "[t]he results of a test performed pursuant to the [ICA] may be introduced into evidence in any civil action or criminal action arising out of the acts alleged to have been committed by the person tested for driving a motor vehicle while under the influence of intoxicating liquor or drugs." Section 66-8-110(A).

**{36}** Provisions governing chemical blood tests, and the timing of blood collections within New Mexico's DWI statutes, the ICA, and SLD regulations have been amended in ways relevant to our interpretation of the specific provisions at issue here. From 1993-2003, New Mexico's DWI provision read (in relevant part) as follows:

> A.      It is unlawful for any person who is under the influence of intoxicating liquor to drive any vehicle within this state.
>
> B.      It is unlawful for any person who is under the influence of any drug to a degree that renders him incapable of safely driving a vehicle to drive any vehicle within this state.
>
> C.      It is unlawful for any person who has an alcohol concentration of eight one-hundredths or more in his blood or breath to drive any vehicle within this state.

NMSA 1978, § 66-8-102 (1993). Notably, although Subsection C established a presumptive level of impairment (blood alcohol concentration (BAC) of .08 or higher), the statute did not contain any provision governing the timing of blood alcohol tests. This Court recognized that "[t]iming is an essential element of the crime" under any of these subsections, and that [S]ubsection C in particular required "[t]he State [to] prove a nexus between a BAC of 0.08 or more" at the time "defendant operated a motor vehicle" *State v. Baldwin*, 2001-NMCA-063, ¶ 8, 130 N.M. 705, 30 P.3d 394 (internal quotation marks and citation omitted). We also recognized both the inevitability of some delay in testing, and the difficulty of "[e]xtrapolating backward in time[,] . . . even for experts," suggesting that our Legislature "could choose to create a statutory inference that a 0.08

BAC within a specified time, say two or three hours after driving, is prima facie evidence of a per se violation of Section 66-8-102(C), which a defendant could then try to rebut." *Baldwin*, 2001-NMCA-063, ¶¶ 17, 19; *see State v. Christmas*, 2002-NMCA-020, ¶ 22, 131 N.M. 591, 40 P.3d 1035 (stating that "it would be preferable if the [L]egislature would prescribe a relation-back period by statute so that a jury could rely on a subsequent, timely BAC test result as a presumptive surrogate for what the BAC likely was at the time of driving"). At the time of these observations, the SLD regulations provided, with respect to the timing of blood tests, that "[t]he initial blood samples should be collected within two hours of arrest." 7.33.2.12(A)(2) NMAC (2001).

**{37}** Then, in 2007, the Legislature amended the DWI statute as follows:

> It is unlawful for . . . a person to drive a vehicle in this state if the person has an alcohol concentration of eight one hundredths or more in the person's blood or breath *within three hours of driving the vehicle and the alcohol concentration results from alcohol consumed before or while driving the vehicle*[.]

NMSA 1978, § 66-8-102(C)(1) (2007) (emphasis added). The Legislature also added the following provision to the ICA:

> If the test performed pursuant to the [ICA] is administered more than three hours after the person was driving a vehicle, the test result may be introduced as evidence of the alcohol concentration in the person's blood or breath at the time of the test and the trier of fact shall determine what weight to give the test result for the purpose of determining a violation of Section 66-8-102[.]

Section 66-8-110(E).

**{38}** The interaction between these amended statutory provisions and the SLD regulation was raised in *Bowden*, where a defendant appealed his conviction under Section 66-8-102(C)(1), arguing that the SLD regulation providing that blood samples "should be collected within two hours of arrest" mandated exclusion of his blood-alcohol test result, the test having been conducted two hours and forty minutes after his arrest. *Bowden*, 2010-NMCA-070, ¶ 4 (internal quotation marks and citation omitted). We held that, while the regulation's two-hour testing requirement was accuracy-ensuring, and therefore would be a foundational requirement for admission of blood-alcohol test results in evidence, the amendment to the ICA in Section 66-8-110(E) superseded the regulation by permitting the introduction of results of tests administered after three hours as "evidence of the alcohol concentration in the person's blood or breath at the time of the test," with "the trier of fact" to "determine what weight to give the test result." *Bowden*, 2010-NMCA-070, ¶¶ 7-11 (internal quotation marks and citation omitted). We explained that a statute prevails over an inconsistent regulation. *Id.* ¶ 12 (citing, inter alia, *Jones v. Emp't Servs. Div. of Human Servs. Dep't*, 1980-NMSC-120, ¶ 3, 95 N.M.

97, 619 P.2d 542, holding that "[a]n agency by regulation cannot overrule a specific statute").

**{39}** The State advocates that we extend *Bowden* to hold that Section 66-8-110(E) also supersedes the SLD regulation with respect to blood tests for drugs. The State argues that reading the statute literally would produce the absurd result of excluding drug test results, but admitting blood-alcohol results from blood tests administered more than three hours after driving. We could so hold, particularly given the stated intent of the Legislature to provide for the admissibility of "chemical tests," presumably including drug tests, taken more than three hours after driving. S.B. 440, 48th Leg., Reg. Sess. (2007) (proposing the 2007 amendments to the ICA and DWI statutes, describing the amendments, in apparent reference to Section 66-8-110(E), as "providing for the admissibility of chemical tests taken more than three hours after driving"); *see Willie*, 2009-NMSC-037, ¶ 9 (holding that we do not read a statute literally where such a reading would lead to an injustice, absurdity, or contradiction; in such cases "we will construe the statute according to its obvious spirit or reason" (internal quotation marks and citation omitted)). However, we need not take this course, as we are no longer persuaded that the SLD intended its provision regarding the timing of chemical blood tests to be a "cutoff," after which a test lacks sufficient accuracy to be given evidentiary weight in any circumstance. We acknowledge and reiterate that, in general, the greater the delay in chemical testing, the less informative the test is likely to be as to a person's condition at the time of driving. However, it does not necessarily follow that the SLD intended to establish a window of time in which a driver suspected of DWI *must* be tested for the result to have probative value.

**{40}** Following our decision in *Bowden*, the SLD amended its regulations to provide that initial blood samples "should be collected within *three* hours of arrest." 7.33.2.15(A)(2) NMAC (emphasis added). We conclude that the SLD intended in this subsection to establish a *preference*, not a mandate, for testing within a three-hour window, at least in part so that any BAC test result of 0.08 or higher would be probative under the statutory presumption set forth in Section 66-8-102(C)(1). Several factors favor this interpretation. First, the SLD apparently amended the provision in 2010 to align with the statutory presumption enacted in 2007, as described hereinabove. Second, if the intent of the SLD provision was always to bar, on accuracy grounds, the admissibility of tests administered after a certain length of time, surely the SLD would not have responded to the statutory amendments by expanding the timeframe for all chemical blood testing. Third, the SLD has continued to use the word "should" rather than "shall" or "must," suggesting that the SLD does not view the provision as mandatory, but as preferred or recommended. *See, e.g.*, Federal Plain Language Guidelines, 25 (March, 2011, rev. May, 2011), https://www.plainlanguage.gov/media/FederalPLGuidelines.pdf (guiding writers of regulations to use "should" for a recommendation). The SLD used the term "shall," a term with mandatory connotations, in many other subsections of the SLD regulations, but not here. *See, e.g.*, 7.33.2.15(A)(1) NMAC (providing that "[b]lood samples shall be collected in the presence of the arresting officer or other responsible person who can authenticate the samples"); *see also Redman v. Bd. of Regents of N.M. Sch. for*

*Visually Handicapped*, 1984-NMCA-117, ¶ 17, 102 N.M. 234, 693 P.2d 1266 ("The use of the word 'shall' ordinarily imposes a mandatory requirement."); *see also Anderson v. United Tel. Co. of Kan.*, 933 F.2d 1500, 1502 (10th Cir. 1991) (stating that "the legislature's use of two different terms is presumed to be intentional").

**{41}** Finally, and most critically, we can hardly imagine that the SLD amended its provisions knowing that alcohol tests administered after three hours would be admissible as evidence of blood alcohol levels at the time of testing, but intending that drug tests so administered would be inadmissible. Unlike alcohol, "drugs" as a category encompass everything from prescription medications to heroin—a wide variety of chemicals, processed by and stored in the body in myriad ways, and causing varying effects. The significance of a drug test administered at any point in time after an arrest will have at least some variance according to substance. More critically, in New Mexico, there are no statutory presumptions with respect to drugs—the State must always establish that the presence of a drug in the defendant's body at the time of testing is probative as to the defendant's alleged impairment at the time of driving. *See* § 66-8-102(B) (providing that "[i]t is unlawful for a person who is under the influence of any drug to a degree that renders the person incapable of safely driving a vehicle to drive a vehicle within this state"); *Baldwin*, 2001-NMCA-063, ¶ 8 (confirming that the state must prove an excessive BAC at the time of driving). This context reveals no reason that the SLD would select three hours as a mandatory cutoff for all drug test results.

**{42}** In sum, we conclude that the SLD's amended regulation, 7.33.2.15(A)(2) NMAC, establishes a preference for blood tests to be administered within a time-frame that permits a statutory presumption of impairment if the BAC result is 0.08 or higher, while still allowing blood tests (for alcohol or drugs) to be administered outside of this time-frame and given appropriate weight under the factual circumstances of each case. Accordingly, we hold that Defendant's blood test did not lack a foundation due to the test having been administered approximately four hours after the accident in this case.[4]

**Admissibility of Expert Testimony**

**{43}** Defendant also argues that the district court abused its discretion by admitting the testimony of the State's toxicology expert, Ms. Sarker, because Ms. Sarker's opinion was unreliable and inadmissible. Defendant failed to preserve this argument. A claimed error in admission of evidence is not preserved unless the party claiming the error timely objected and stated the specific basis. *See* Rule 11-103(A)(1) NMRA; Rule 12-321(A) NMRA; *see also State v. Walters*, 2007-NMSC-050, ¶ 18, 142 N.M. 644, 168 P.3d 1068 ("In order to preserve an issue for appeal, a defendant must make a timely objection that specifically apprises the trial court of the nature of the claimed error and invokes an intelligent ruling thereon." (internal quotation marks and citation omitted). Here, while Defendant contends that he preserved his argument through "multiple defense objections," the portions of the record to which Defendant directs us are defense counsel's objections to Ms. Sarker's qualifications to testify as to the effect of drugs on

---

[4]We assume without deciding that "arrest" is used in 7.33.2.15(A)(2) NMAC is synonymous with "accident," or "time of driving," an argument advanced by Defendant and not contested by the State.

human behavior and driving ability. Ms. Sarker was questioned by counsel and the district court with respect to her qualifications to testify on this issue, but—once the court qualified Ms. Sarker as an expert—defense counsel made no objections as to the substance of Ms. Sarker's opinions or the reliability of her methodology as applied in this case. Indeed, Defendant concedes that the district court advised counsel at the conclusion of trial that a *Daubert* motion and hearing would have been beneficial, noting that "qualifications versus reliability [of expert opinions] are different things." We agree. *See United States v. Avitia-Guillen*, 680 F.3d 1253, 1257 (10th Cir. 2012) (holding that "[w]here a party objects only to an expert's qualifications, he does not preserve an objection to the expert's methodology").

**{44}** Although Defendant raises no argument that admission of Ms. Sarker's testimony constituted fundamental or plain error, we have the discretion to review the district court's decision under these standards. *See* Rule 11-103(E) ("A court may take notice of a plain error affecting a substantial right, even if the claim of error was not properly preserved."); Rule 12-321(B)(2)(b), (c) (permitting the appellate court in its discretion to review issues involving plain or fundamental error); *State v. Lucero*, 1993-NMSC-064, ¶ 12, 116 N.M. 450, 863 P.2d 1071 (citing *State v. Barraza*, 1990-NMCA-026, ¶ 17, 110 N.M. 45, 791 P.2d 799). "The rule of fundamental error applies only if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been done." *State v. Orosco*, 1992-NMSC-006, ¶ 12, 113 N.M. 780, 833 P.2d 1146. Plain error, which applies only to evidentiary matters, is a less stringent standard than fundamental error, but the error must affect a substantial right of the defendant, such that we have "grave doubts concerning the validity of the verdict and the fairness of the trial." *Lucero*, 1993-NMSC-064, ¶¶ 12, 22.

**{45}** Review for plain or fundamental error on unpreserved expert issues may prove, as it does here, an extremely difficult task. Our observations from *Barraza*, 1990-NMCA-026, ¶ 3, are fitting:

> [T]his case does not present a suitable vehicle for us to accomplish more than providing a few limited observations. Proper analysis of the subtleties arising in [this] testimony requires that the issue be focused in the trial court. When a specific objection is raised to such testimony, counsel for both parties can produce an appropriate record and the trial judge can exercise an informed discretion. We can then review whether that discretion was abused. In this case, however, the most troubling contentions raised in [the] defendant's brief . . . were not preserved for appeal because they were not raised in the trial court. Therefore, we need not address them to dispose of this appeal. Nor do we think it wise to utter dicta on subtle evidentiary matters without a record that presents the issues with greater clarity than does the record here.

(Citations omitted.) Accordingly, we are able to conduct only a limited review of Defendant's arguments.

**{46}**     Defendant compares this case to *Downey*, 2008-NMSC-061, ¶¶ 28-34, in which our Supreme Court held that scientific expert testimony[5] will only assist the trier of fact if the expert's methodology "fits" the facts of the case. According to Defendant, Ms. Sarker's opinion did not "fit" the facts of this case because her opinion was predicated on assumptions, which had no evidentiary foundation in the record. Defendant points to Ms. Sarker's testimony that the effect of the drugs found in Defendant's blood on a person's ability to drive depends on a person's metabolism, the length of time the person has used the drugs, and a person's sensitivity to the effects of the drugs. Ms. Sarker conceded that she knew none of these things about Defendant, nor did she have information about his injuries or his medical treatment after the accident, which may have impacted both his drug test results and his behavior in the hospital. Accordingly, Defendant contends, Ms. Sarker's opinion that Defendant was impaired at the time of driving was mere guesswork.

**{47}**     Defendant is correct that, for scientific evidence to be admissible under Rule 11-702, "the reasoning or methodology underlying the testimony must not only be scientifically valid, it also must be properly applied to the facts in issue." *Downey*, 2008-NMSC-061, ¶ 30 (alteration, emphasis, and internal quotation marks omitted). In *Downey*, the expert purported to apply a retrograde extrapolation analysis of the defendant's BAC, but "did not have the facts necessary to plot [the d]efendant's placement on the BAC curve[.]" *Id.* ¶ 33. Here, however, Defendant does not identify the methodology he contends was misapplied by Ms. Sarker. Although Ms. Sarker testified that the effects of a drug or drugs on a person varies according to factors such as a person's metabolism and sensitivity, she never testified that her methodology requires direct knowledge of these variables. Rather, she testified that she based her opinion on Defendant's toxicology results, his driving behavior, and his interactions with Officer Benally at the hospital. Defendant never challenged (here or at trial) the soundness of this methodology as applied in this case. Such testing of Ms. Sarker's methodology could have included whether, for instance, Defendant's behavior at the hospital were attributable to his injuries and/or possible medication administration, Defendant's toxicology results and his driving behavior alone were capable of supporting Ms. Sarker's opinion. We cannot analyze these issues in a vacuum. The district court found that Ms. Sarker was qualified to offer an opinion on whether Defendant was impaired by drugs at the time of the collision, and Defendant does not challenge Ms. Sarker's qualifications on appeal. The district court's role is to ensure that "the scientific procedure which supports the testimony is . . . capable of supporting opinions based upon a reasonable probability rather than conjecture." *State v. Alberico*, 1993-NMSC-047, ¶ 98, 116 N.M. 156, 861 P.2d 192 (internal quotation marks and citation omitted). On this record, we cannot say that an alternative explanation for Defendant's behavior at the hospital rendered Ms. Sarker's methodological procedures incapable of supporting an opinion based on reasonable probability rather than conjecture. While Ms. Sarker's conclusions may be shaky, it was the jury's province to weigh them. *See*

---

5There is no dispute that Ms. Sarker's testimony is subject to the requirements for scientific expert testimony, as set forth in *State v. Torres*, 1999-NMSC-010, ¶¶ 25-26, 127 N.M. 20, 976 P.2d 20 (describing factors to guide the district court in analyzing the reliability of scientific knowledge and testimony).

*Acosta v. Shell W. Expl. & Prod., Inc.*, 2016-NMSC-012, ¶ 41, 370 P.3d 761; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Moreover, "any doubt regarding the admissibility of [expert opinion] evidence should be resolved in favor of admission, rather than exclusion." *Lee v. Martinez*, 2004-NMSC-027, ¶ 16, 136 N.M. 166, 96 P.3d 291. For all these reasons, while we agree with the district court that a *Daubert* hearing would have been beneficial in this case, the admission of Ms. Sarker's testimony does not cause us grave concern about the validity of the verdict or the fairness of Defendant's trial, and therefore such admission did not constitute plain or fundamental error.

**Sufficiency of the Evidence**

**{48}**   Defendant's last argument is that the State failed to present sufficient evidence to sustain his convictions. Sufficient evidence means "substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314. In reviewing the evidence, we must view it "in the light most favorable to the state, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict." *Id.* We do not reweigh the evidence or substitute our judgment for that of the jury. *See id.* (explaining that "[a]n appellate court does not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence").

**{49}**   With respect to his convictions for homicide and great bodily harm by vehicle, Defendant first alleges that "the State has failed to prove" an essential element of both crimes: namely, that Defendant was under the influence of oxycodone, alprazolam and marijuana to the extent that he was incapable of safely driving a vehicle. *See* §§ 66-8-101(C), -102(B); UJI 14-240(B), (D) NMRA; UJI 14-245 NMRA. According to Defendant, even if Ms. Sarker's testimony was admissible as sufficiently reliable, her opinion that "the toxicology report was 'consistent' with the accident does not establish beyond a reasonable doubt that [Defendant] was impaired to the degree that he was incapable of safely driving." Defendant cites *State v. Consaul*, 2014-NMSC-030, ¶ 73, 332 P.3d 850, for the proposition that, where the State relies "solely" on expert opinion testimony to establish an element of a crime, the expert's opinion must go beyond a reasonable degree of probability for a jury to find the element established beyond a reasonable doubt.

**{50}**   First, Defendant's reference to Ms. Sarker's testimony is incomplete. Ms. Sarker also testified that, in her opinion, based on the totality of the circumstances, Defendant was unable to drive safely at the time of the accident. She further testified that, even if Defendant was administered oxycodone after the accident, it was her opinion that the additive effects of alprazolam and THC had impaired Defendant's ability to drive safely. Second, our Supreme Court in *Consaul* contrasted the isolated medical expert testimony in that case with "most cases," in which "additional non-opinion evidence,

such as forensic evidence, supplements an expert's opinion," allowing the jury to "draw supporting inferences and reason from the totality of the evidence to find proof beyond a reasonable doubt." *Id.* ¶ 71. There was such additional evidence here. Ms. Yurkovich testified that the white sedan was weaving onto the shoulder and into the opposite lane of traffic even before the collision occurred. Sergeant Atencio testified that there was no evidence that Defendant either braked or swerved to avoid an obstacle in the road, consistent with the testimony of Ms. Yurkovich and Ms. Vigil that the road was clear just before the collision. According to Major Vigil, after the accident, the white sedan not only smelled strongly of marijuana, but e-cigarettes were found on the floorboard of the driver's side and in the driver's side door panel, along with marijuana in the driver's side door panel. At the hospital, Officer Benally observed that Defendant's eyes were red and glassy. Although we agree that emergency medical personnel may have administered a pain medication such as oxycodone to Defendant, no evidence suggested that Defendant may have been administered marijuana or alprazolam, an anti-anxiety medication, after the accident. The evidence also shows that Defendant was initially unconscious, then had to be removed from the vehicle and airlifted to a hospital, rendering it extremely unlikely that he used marijuana or alprazolam between the collision and the drug test. All of this supported Ms. Sarker's opinion, such that the jury could "reason from the totality of the circumstances to find proof beyond a reasonable doubt" that Defendant was under the influence of, at a minimum, alprazolam and marijuana, to the extent that he was incapable of safely driving a vehicle at the time of the collision.

**{51}** Defendant also contends that the State failed to prove that the accident was not the result of the black SUV attempting to pass Ms. Vigil. We interpret this argument as a limited challenge to the evidence in support of causation (that Defendant's driving while under the influence of drugs caused the death of Ms. Hinds and the injuries to Ms. Vigil). Defendant contends that "[t]he State's own evidence established that the negligence of the SUV driver was the only significant cause of the accident." We cannot agree with this characterization. The only evidence that the black SUV attempted a pass, prior to the collision, was Dr. Mikkelson's testimony, which lends little if any support to Defendant's theory. Dr. Mikkelson testified that the black SUV had returned to the northwest-bound lane, and that Dr. Mikkelson had slowed down to allow more space between his vehicle and the black SUV *before* the collision occurred. And, as noted by Officer Atencio, there was no evidence that Defendant swerved aggressively or braked to avoid a collision. This evidence is inconsistent with a theory that Defendant collided with Ms. Vigil in an attempt to avoid the black SUV. Furthermore, the State was not charged with eliminating every theory consistent with Defendant's innocence. The jury weighed the evidence and was free to reject Defendant's version of the facts. *See State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515. Our inquiry is not whether the jury could have reached a different conclusion, but whether there was substantial evidence for the conclusion the jury did reach. *See In re Ernesto M., Jr.*, 1996-NMCA-039, ¶ 15, 121 N.M. 562, 915 P.2d 318. Defendant does not engage that larger inquiry with respect to causation, so neither do we. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 (holding that the appellate court does not review undeveloped arguments).

**{52}** Concerning Defendant's convictions for possession of marijuana and drug paraphernalia, Defendant argues that the State failed to prove constructive possession. Specifically, Defendant argues that the State proved only Defendant's proximity to the drugs and paraphernalia found in the white sedan, but "failed to prove that [Defendant] had knowledge [of,] or control over," those items. We are unpersuaded.

**{53}** UJI 14-130 NMRA defines possession as follows:

A person is in possession of (name of object) when, on the occasion in question, he knows what it is, he knows it is on his person or in his presence and he exercises control over it.

Even if the object is not in his physical presence, he is in possession if he knows what it is and where it is and he exercises control over it.

Two or more people can have possession of an object at the same time.

A person's presence in the vicinity of the object or his knowledge of the existence or the location of the object is not, by itself, possession.

**{54}** Thus, the possession element of an offense is satisfied where there are facts from which a jury could reasonably infer that the defendant "(1) knew of the presence of the [object at issue], and (2) exercised control over it." *State v. Maes*, 2007-NMCA-089, ¶ 13, 142 N.M. 276, 164 P.3d 975; *see State v. Brietag*, 1989-NMCA-019, ¶ 14, 108 N.M. 368, 772 P.2d 898 (holding that possession requires a "rational connection between the location of the [object] and [the] defendant's probable knowledge and control [over it]"); *see also State v. Barber*, 2004-NMSC-019, ¶ 28, 135 N.M. 621, 92 P.3d 633 (noting that "possession denotes facts pertaining to the relationship between a person and an item of property, as well as the consequences that attach to those facts" (internal quotation marks and citation omitted)). A jury may infer knowledge and control from the defendant's actions, statements, or conduct, and from circumstantial evidence connecting the defendant to the object. *Barber*, 2004-NMSC-019, ¶ 27; *State v. Phillips*, 2000-NMCA-028, ¶ 8, 128 N.M. 777, 999 P.2d 421.

**{55}** Defendant contrasts this case with *State v. Garcia*, in which our Supreme Court held that sufficient evidence supported the defendant's conviction for felony possession of a firearm, where the gun was in a location equally accessible to passenger and driver, but the defendant (passenger) was sitting on a clip which fit the gun. 2005-NMSC-017, ¶¶ 21-24, 138 N.M. 1, 116 P.3d 72. Our Supreme Court acknowledged that other evidence (such as the driver not claiming the gun, and the defendant's beer bottle located next to the gun) supported a finding of possession, but held that it was insufficient to show the necessary control; the defendant sitting on a clip that fit the gun was evidence that "tip[ped] the balance in favor of the verdict." *Id.* ¶ 24. Here, Defendant contends, there is no such definitive evidence. He notes that the white sedan

was registered to Ms. Hinds, who was also present in the vehicle; that many of the items recovered were in the trunk of the vehicle or scattered throughout the vehicle; and that many people had access to the vehicle after the accident, before the items were recovered by the police. Defendant thus implies that the evidence was equally consistent with Ms. Hinds possessing the items in issue, and/or with others having deposited the items in the vehicle.

{56}   We disagree that the evidence presented by the State was merely suggestive of Defendant constructively possessing marijuana and paraphernalia, such that, as in *Garcia*, a further piece of definitive evidence was required. Two people can possess an object at the same time. UJI 14-130. This case is similar to *State v. Bauske*, 1974-NMCA-078, ¶¶ 5, 10, 24, 86 N.M. 484, 525 P.2d 411, where this Court affirmed the district court's conviction of the defendant (after a bench trial) for possession of heroin, finding that the defendant and his wife had jointly, constructively possessed the drug. A search of the vehicle had revealed heroin-related paraphernalia in the wife's purse, in the center console of the vehicle, and in the trunk. *Id.* ¶ 7. There was evidence that the wife had placed an eyeglass case containing heroin and a "fix kit" under the rear seat of the patrol car. *Id.* ¶¶ 8, 10. The fix kit contained a syringe with the defendant's fingerprint on it, and a spoon, engraved with the name of the defendant's child, containing traces of heroin. *Id.* ¶ 8. The defendant had red needle marks on his arm consistent with recent use of heroin. *Id.* ¶ 9. The foregoing constituted substantial evidence that the defendant had "constructively possessed the eyeglass case containing the heroin prior to his wife placing the case under the back seat of the patrol car[.]" *Id.* ¶ 10.

{57}   Similarly, here, there was evidence that the marijuana and paraphernalia were "in a location subject to the joint dominion and control" of Defendant and Ms. Hinds. *See id.* ¶ 5. Ms. Hinds, who owned the vehicle, was Defendant's girlfriend, and she apparently permitted him to operate the white sedan on the date of the accident. As described in detail hereinabove, following the accident, marijuana products and paraphernalia were found throughout the white sedan, including a digital scale in the center console; an e-cigarette, a package of marijuana leaves, and a grinder in the driver's side door compartment; another e-cigarette on the driver's side floor; and syringes containing marijuana wax underneath Ms. Hinds on the passenger seat. Although it is theoretically possible that someone tampered with these items or placed them in the sedan after the accident, and prior to the arrival of the police, there is substantial evidence they were in the sedan and under Defendant's and Ms. Hinds' joint control. Ms. Yurkovich observed the syringes in the passenger seat in the minutes immediately following the accident. The items recovered from the trunk (including nine syringes containing THC residue, a glass smoking pipe containing THC residue, and more marijuana leaves) were similar to the items recovered from the cabin, and there was no evidence that the trunk was opened at any time prior to the vehicle being impounded and searched by the police. The postmortem examination of Ms. Hinds revealed a positive toxicology result for THC, and there was evidence credited by the jury that Defendant was under the influence of drugs including THC at the time of the accident. Major Vigil testified that, when he arrived at the scene and approached the white sedan, there was a strong odor of

marijuana. Moreover, Dr. Mikkelson and Ms. Yurkovich testified that they looked through a wallet in Ms. Hinds' seat, but moved no other objects, and saw no one else move anything in the vehicle before the police arrived.

**{58}**    For all these reasons, we hold that, as in *Bauske*, there was substantial evidence, sufficient to sustain Defendant's convictions, that Defendant constructively possessed drug paraphernalia and marijuana.

**CONCLUSION**

**{59}**    We affirm for the reasons set forth herein.

**{60}    IT IS SO ORDERED.**

**LINDA M. VANZI, Judge**

**WE CONCUR:**

**JACQUELINE R. MEDINA, Judge**

**BRIANA H. ZAMORA, Judge**